**FILED**

**NR**

# UNITED STATES DISTRICT COURT

JUL 0 8 2008

## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

       v

LORENZO INGRAM,
MARTEL JACKSON,
ANTOINE JACKSON,
CRYSTAL JACKSON, and
CHRISTOPHER MOSBY

**CRIMINAL COMPLAINT**

CASE NUMBER **08 CR 531**

**MAGISTRATE JUDGE COLE**

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.

From in or about November 2006 until on or about July 3, 2007 in Kane County, in the Northern District of Illinois, and elsewhere,

defendants did

conspire and agree with each other and others, knowingly and intentionally to distribute and to possess with intent to distribute a controlled substance, namely, at least 50 grams of mixtures containing cocaine base in the form of crack cocaine, a Schedule II Narcotic Drug Controlled Substance,

in violation of Title __21__ United States Code, Section __846__. I further state that I am a

Special Agent for Federal Bureau of Investigation and that this complaint is based on the following facts:
Official Title

Please see attached affidavit.
Continued on the attached sheet and made a part hereof: _x_ Yes _ No

Signature of Complainant

Sworn to before me and subscribed in my presence,

July 8, 2008      at   Chicago, IL
Date             City and State

Jeffrey Cole, Magistrate Judge
Name & Title of Judicial Officer      Signature of Judicial Officer

STATE OF ILLINOIS       )
                               )

COUNTY OF COOK      )

**AFFIDAVIT**

I, Larry L. Lapp, Special Agent of the Federal Bureau of Investigation, United States Department of Justice, having been duly sworn under oath, states as follows:

## I.   INTRODUCTION

1.    I am a Special Agent ("SA") with the United States Department of Justice, Federal Bureau of Investigation ("FBI") and have been so employed for 8 years. I have received specialized training in criminal enterprise matters, and narcotics and dangerous drug investigations while employed as a Special Agent. I am familiar with and have participated in all of the normal methods of investigations, including but not limited to visual surveillance, and use of search warrants, informant and cooperating witness debriefings, pen registers, document analysis, and the utilization of undercover agents/officers. I have been personally involved in investigations of controlled substances-related offenses involving the possession, sale, and distribution of cocaine, heroin, and crack cocaine in the city of Aurora and surrounding communities, and investigations involving distribution of these substances by members of Aurora area street gangs.

2.    I am currently assigned to the Criminal Enterprise Squad, which investigates criminal activity of street gang members in Aurora, Illinois and surrounding communities. I have monitored and been involved in Title III interceptions. I have witnessed the debriefing of informants, have been present to monitor undercover drug buys, and have participated in

1

surveillance. As part of my current assignment, I have investigated criminal violations of the Controlled Substance Act as found in Title 21 of the United States Code, as well as related violations found in Title 18 of the United States Code. Based on my training and experience, I am familiar with the ways in which individuals conduct their drug-related business, including, but not limited to their: (a) methods of distributing narcotics; (b) use of telephone communication devices; and (c) use of code words to identify themselves and the nature of the communication, and to conduct their drug-related transactions.

3.    The information contained in this Affidavit is based on my conversations with and review of reports prepared by agents in the FBI, as well as other law enforcement agents and officers; the results of physical surveillance; information provided by cooperating witnesses; law enforcement's interviews of witnesses; law enforcement's review of recordings of consensually recorded conversations and conversations intercepted pursuant to Court orders authorizing the interception of wire communications. Since this Affidavit is being submitted for the limited purpose of establishing probable cause as set forth herein, I have not included each and every fact known to me concerning this investigation.

4.    This Affidavit is made for the purpose of establishing probable cause in support of a criminal complaint charging:

a.    LORENZO F. INGRAM, also known as ("aka") "D," aka "Trump," aka ("INGRAM");

b.    MARTEL O. JACKSON, aka "O'Shea," aka "Cheetah"; ("M. JACKSON");

c.    ANTOINE JACKSON, aka "Red" ("A. JACKSON");

d.    CRYSTAL R. JACKSON ("C. JACKSON"); and

2

e.    CHRISTOPHER A. MOSBY, aka "BO" ("MOSBY")

with conspiring with each other and with others known and unknown to the United States to

knowingly and intentionally possess with intent to distribute and to distribute controlled

substances, namely, in excess of 50 grams of mixtures containing cocaine base in the form

of crack cocaine, in violation of Title 21, United States Code, section 841(a)(1), in violation

of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2.

## II.    OVERVIEW

### A.    <u>Introduction</u>

5.    In November 2006, the FBI along with law enforcement personnel from the

Batavia Police Department ("BPD") and Aurora Police Department ("APD") began an

investigation into the drug distribution network of INGRAM. Between November 2, 2006

and March 9, 2007, an Undercover Employee (UCE1) contacted INGRAM on his cellular

phone on multiple occasions to arrange the purchase quantities of crack cocaine. After

determining the quantity of crack cocaine that UCE1 wanted, INGRAM set up meet

locations. INGRAM either delivered the crack cocaine to UCE1 himself, or he solicited the

assistance of his associates, M. JACKSON and A. JACKSON to deliver the crack cocaine

for him. UCE1 purchased approximately 109 grams of crack cocain from INGRAM, M.

JACKSON and A. JACKSON by contacting INGRAM on his cell phone between November

2, 2006 and March 9, 2007.

6.    On March 14, 2007, INGRAM was arrested by the APD for Armed Violence,

3

Aggravated Discharge of a Weapon, and Aggravated Unlawful Use of a Weapon. Since INGRAM was in custody, M. JACKSON continued the drug distribution network already established by INGRAM by using INGRAM's cellular phone to contact INGRAM's customers including UCE1. Specifically, UCE1 contacted INGRAM's cellular phone and spoke with M. JACKSON. UCE1 then met with and purchased approximately 21.3 grams of crack cocaine from M. JACKSON on March 20, 2007.

7.    On May 14, 2007, an Application, Affidavit, and Court Order was approved in the United States District Court in the Northern District of Illinois, Eastern Division authorizing the interception of wire communications to and from a cellular phone number ("**Target Phone 1**") used by M. JACKSON. From May 14, 2007 until July 3, 2007, communications between M. JACKSON, his associates, and his drug customers were intercepted. M. JACKSON using **Target Phone 1** and **Target Phone 2** with the assistance of C. JACKSON, Co-Conspirator A, and others distributed crack cocaine more than 50 grams of crack cocaine to various individuals including MOSBY.

### B.    Roles of Defendants

8.    The following is a brief summary of the roles each co-conspirator played in the conspiracy and the paragraphs in this Affidavit pertaining to each:

a.    **LORENZO F. INGRAM**: was the leader of the drug distribution business that sold quantities of crack cocaine in the city of Aurora and surrounding communities. INGRAM directed others, such as M. JACKSON and A. JACKSON to help

4

coordinate the distribution of crack cocaine. See ¶¶, 16-71.

b.    **MARTEL O. JACKSON**: ran the drug distribution business after INGRAM was incarcerated, operating in Aurora and the surrounding communities. JACKSON directed others such as C. JACKSON, Co-Conspirator A, and Co-Conspirator B, to help coordinate the distribution of crack cocaine and to help collect money from established resellers including MOSBY. See ¶¶, 23-148.

c.    **A. JACKSON**: assisted INGRAM in the distribution of crack cocaine. See paragraphs, ¶¶, 51-66

d.    **C. JACKSON**: assisted M. JACKSON in the distribution of crack cocaine. See ¶¶, 122-123, 127-128, 145-147.

e.    **MOSBY**: was a reseller working with M. JACKSON by establishing a customer base at the Hansen Hotel located in Aurora, Illinois. MOSBY recruited customers and obtained his supply of crack cocaine on a daily basis from M. JACKSON. See ¶¶, 95-98, 111-121, 124-126, 135-141, 148.

C.    **The Undercover Employee**

9.    This investigation utilized an undercover employee UCE1. UCE1 had contact with members of the conspiracy, namely INGRAM, M. JACKSON, and A. JACKSON. UCE1 held himself/herself as a drug dealer from Waterman, Illinois, who needed to obtain quantities of crack cocaine to sell to his/her customers.

10.    During the course of the investigation, UCE1 conducted consensually recorded

conversations with members of the conspiracy and conducted controlled and surveilled purchases of narcotics from members of the conspiracy. Those purchases include: 1) approximately 1.9 grams of crack cocaine from INGRAM on or about November 2, 2006; 2) approximately 6.6 grams of crack cocaine from INGRAM on or about November 7, 2006; 3) approximately 5.8 grams of crack cocaine from INGRAM and M. JACKSON on or about November 28, 2006; 4) approximately 6.1 grams of crack cocaine from INGRAM and M. JACKSON on or about December 9, 2006; 5) approximately 5.8 grams of crack cocaine from INGRAM and M. JACKSON on or about December 18, 2006; 6) approximately 3.6 grams of crack cocaine from INGRAM on or about January 5, 2007; 7) approximately 9.9 grams of crack cocaine from INGRAM on or about January 16, 2007; 8) approximately 9.5 grams of crack cocaine from INGRAM on or about January 25, 2007; 9) approximately 5.4 grams of crack cocaine from INGRAM and A. JACKSON or or about February 21, 2007; 10) approximately 14.8 grams of crack cocaine from INGRAM and A. JACKSON on or about February 27, 2007; 11) approximately 18.3 grams of crack cocaine from INGRAM and M. JACKSON on or about March 9, 2007; and 12) approximately 21.3 grams of crack cocaine from M. JACKSON on or about March 20, 2007.

**D.    Surveillance**

11.    During the course of the investigation, law enforcement officers have surveilled the conduct of co-conspirators in and around Aurora, Illinois and the surrounding communities including Naperville, Illinois and Batavia, Illinois. The surveillance has

included observations of hand-to-hand drug transactions between targets of this investigation and UCE1. Those transactions involve co-conspirators directing UCE1 to specific locations in order for the co-conspirators to sell quantities of crack cocaine to UCE1. Surveillance in this investigation also included monitoring M. JACKSON's activities while monitoring cellular phones used by M. JACKSON to include observations of hand-to-hand drug transactions between M. JACKSON , other co-conspirators or M. JACKSON, and some of M. JACKSON's drug customers.

### E.　　The Wiretap Investigation

12.　　Between May 2007 and July 2007, the FBI obtained court authorization to intercept wire communications over the following telephones used by members of the conspiracy:

　　　　a.　　**Target Phone 1**. On May 14, 2008 and June 13, 2007, Chief Judge James F. Holderman entered orders authorizing the interception of wire communications to and from the cellular telephone bearing (630) 278-0217, ESN 01901757464, subscribed to Jamie Jazz, used by M. JACKSON, 1243 East New York Street, Aurora, Illinois 60505, operated on the network of service provider U.S. Cellular (hereinafter "**Target Phone 1**").

　　　　b.　　**Target Phone 2**. On June 4, 2007, Acting Chief Judge Wayne R. Anderson entered an order authorizing the interception of wire communications to and from the cellular telephone bearing (630) 201-8374, ESN 03412812630, subscribed to Samantha Jones, used by M. JACKSON, 612 South State Route 59, Naperville, Illinois 60540-0900,

operated on the network of service provider U.S. Cellular (hereinafter "**Target Phone 2**").

13.      In many of the intercepted and consensually recorded calls, coded language was used to conceal the true nature of the telephone calls. At various points in this Affidavit, I have placed my understanding of what was being said during those calls in parenthesis. My understanding is based on the contents and context of the conversations, my experience as a law enforcement officer, and the experience of other law enforcement agents and officers in this investigation. The times listed for these calls are approximate. Finally, the summaries below do not include all potentially criminal calls intercepted during the period of interception, or all statements or topics covered during the course of intercepted conversations. They are based on preliminary, not final, transcripts and may not represent the entire conversation that occurred between the identified individuals.

F.      **Seizures**

14.      The investigation has resulted in numerous narcotics seizures, some of which are detailed in Section IV, that total more than 100 grams of a crack cocaine.

15.      The investigation has also resulted in the seizure of $2,704 from M. JACKSON during a traffic stop.

IV.      **PROBABLE CAUSE FOR REQUESTED COMPLAINT**

A.      **Controlled Drug Purchases from INGRAM,  M. JACKSON, and A. JACKSON**

### (1)    November 2, 2006 Controlled Purchase from INGRAM

16.    On November 2, 2006, UCE1 called INGRAM[1] at telephone number (630) 201-9272 (hereinafter "Ingram Phone A").[2] During this conversation, which was recorded, UCE1 told INGRAM that s/he had $150 this time.[3] INGRAM and UCE1 then agreed to meet at the R&S Liquor Store, 415 East Wilson Street, Batavia, Illinois, in about 20 to 25 minutes. After being provided $150 in undercover funds and after being equipped with a recording device, UCE1 was dropped off near the area of the liquor store parking lot. UCE1 then walked on foot to this location and waited for INGRAM to arrive. At approximately 6:57 p.m., surveillance agents saw a white Lincoln, license number 9443719 (hereinafter, the "White Lincoln") pull into the parking lot, and UCE1 got into the vehicle.[4]

17.    During this transaction, which was recorded, UCE1 told INGRAM that s/he

_____

[1]The identification of INGRAM in this Affidavit is based upon the following: First, UCE1 identified INGRAM from a State of Illinois Driver's License photograph. Second, law enforcement has been able to identify INGRAM's voice becasue that voice was consensually recorded during telephone calls between INGRAM and UCE1; becasue INGRAM had identified himself in many of those calls with the same alias names ("D"), and becasue the voice was consistently associated with phone numbers provided to UCE1 by INGRAM. Third, during particular consensual phone calls, INGRAM arranged to personally meet with UCE1, and these subsequent meetings were surveilled.

[2]Subscriber records reflect that Ingram Phone A is subscribed to LORENZO F. INGRAM, date of birth October 24, 1983, Illinois Driver's License number L526-5268-3303, and address 571 East New York Street, Aurora, Illinois 60505-3553. This information is the same information INGRAM provided to the APD when INGRAM was arrested on October 12, 2006.

[3] In an unrecorded but surveilled transaction, in October 2006 in Batavia, UCE1 then purchased 2 grams of suspect crack cocaine from INGRAM. UCE1 then identified INGRAM by viewing a copy of INGRAM's State of Illinois driver's license photograph.

[4] According to Illinois Secretary of States Office, license number 9443719, is registered to LORENZO F. INGRAM, 571 East New York Street, Aurora, Illinois 60505, on a 1994 Lincoln.

9

wanted $150 ($150 worth of crack cocaine). INGRAM then pulled out a plastic bag from his waistband containing what appeared to UCE1 to be a white rock like substance which UCE1 believed to be crack cocaine. UCE1 then watched as INGRAM proceeded to bite a piece off of the crack cocaine, which he then gave to UCE1. UCE1 then handed INGRAM the money.

18.     The substance purchased from INGRAM was subsequently submitted to the Drug Enforcement Administration ("DEA") Crime Lab for analysis, which showed that the substance was 1.9 grams of cocaine base. Based upon your Affiant's experience, the off white rock like appearance of the substance bought, and the lab results, your Affiant believes the substance bought from INGRAM was crack cocaine.

### (2)     November 7, 2006 Controlled Purchase from INGRAM

19.     On November 7, 2006, UCE1 called INGRAM at Ingram Phone A. During this conversation, which was recorded, UCE1 asked INGRAM how much a "half" (meaning half an ounce of crack cocaine) cost. INGRAM told UCE1 that they did not really sell "it" (meaning crack cocaine) that way because of certain drug dealers' recent arrests. INGRAM told UCE1 that he would call his "High Level Man" (drug supplier) to see what he would have to say about it. INGRAM then asked UCE1 if s/he would be able to come out and get "it"(meaning the cocaine). When UCE1 told INGRAM that s/he was "on foot and not driving," INGRAM told UCE1 that he (INGRAM) would have to go to Sugar Grove to get it, so he would have to call UCE1 back.

20. After waiting over an hour, UCE1 called INGRAM back on Ingram Phone A. During this conversation, which was recorded, INGRAM told UCE1 that "his man" (supplier) said that "they were not going to do it that way" (not going to sell a larger amount to UCE1 at this time), but INGRAM was willing to give UCE1 "475" (meaning $475 worth of crack cocaine) for "425" ($425). INGRAM and UCE1 then agreed to meet at the same liquor store parking lot in Batavia where they had met previously.

21. UCE1 was then provided $430 in undercover funds and was subsequently dropped off near the liquor store parking lot. UCE1 then walked to this location and waited for INGRAM to arrive. At approximately 3:22 p.m., surveillance saw INGRAM arrive at the liquor store driving the white Lincoln. During this transaction, which was recorded, UCE1 walked up to the driver's side window of INGRAM's vehicle and noticed a clear plastic bag of what appeared to be crack cocaine, a white rock like substance, sitting on INGRAM's lap and another clear plastic bag of a white rock like substance that UCE1 believed was crack cocaine sitting in the center console in a cup holder. INGRAM then gave UCE1 one of the plastic bags, and UCE1 gave INGRAM the $430.[5] As INGRAM left the location, he told UCE1 to call him.

22. The substance purchased from INGRAM was subsequently submitted to the DEA ("DEA") Crime Lab for analysis, which showed that the substance was 6.6 grams of cocaine base. Based upon your Affiant's experience, the white rock like appearance of the

---

[5] Although UCE1 and INGRAM agreed that UCE1 would pay $425 for the crack cocaine, INGRAM did not provide UCE1 with any change when UCE1 gave INGRAM $430.

substance bought, and the lab results, your Affiant believes the substance bought from INGRAM was crack cocaine.

### (3)     November 28, 2006 Controlled Purchase from INGRAM and M. JACKSON

23.     On November 28, 2006, UCE1 called INGRAM at Ingram Phone A. During this call, which was recorded, UCE1 told him that s/he had "400" ($400) and asked if that was good. INGRAM then told UCE1 that he would take care of him/her, and they agreed to meet at the same liquor store parking lot in about 30 minutes. UCE1 was provided $400 in undercover funds and was again dropped off near the area of the liquor store. UCE1 then walked on foot to this location waiting for INGRAM to arrive. Because INGRAM did not arrive right away, UCE1 called him on his cellular phone INGRAM Phone A. During this conversation, which was partially recorded[6], INGRAM told UCE1 that he ran into some difficulty, but he would be there shortly.

24.     While still waiting, UCE1 received a series of phone calls from an unknown male, who identified himself as INGRAM's brother. During these calls, which were partially recorded, this individual told UCE1 that he was bringing "it" (meaning crack cocaine) to UCE1, and UCE1 proceeded to give this individual some directions to the liquor store.

25.     At approximately 5:32 p.m., surveillance saw the White Lincoln pull into the

---

[6]Unless otherwise noted, the phrase "partially recorded" in this affidavit will refer to those circumstances where UCE1 was wearing a body recording and received or made a phone call, UCE1, voice can be heard, but the party on the other line in most instances can only be partially heard or not heard at all.

parking lot area. UCE1 then walked up to the rear passenger side window where an individual later identified as M. JACKSON[7] was sitting. During this transaction, which was recorded, UCE1 gave M. JACKSON the $400, and when M. JACKSON finished counting the money, he directed an unidentified female in the passenger front seat to hand UCE1 a plastic bag containing a white rock like substance that UCE1 believed was crack cocaine. UCE1 then asked M. JACKSON if s/he should call him or INGRAM. M. JACKSON then gave UCE1 a phone number, (630) 862-7965, (hereinafter Jackson Phone A) which he told UCE1 to call since INGRAM's other number was going to be out of service soon. After the white Lincoln left the lot and while UCE1 was walking back to a staging area, UCE1 received a phone call from M. JACKSON. During this conversation, which was partially recorded, the male told UCE1 that his name was "CHEETAH" and asked UCE1 how often s/he was "coming out" (purchasing crack cocaine). When UCE1 told M. JACKSON s/he was ordering crack cocaine every other week, M. JACKSON told UCE1 that the more s/he spent, the more and better quality UCE1 would receive.

26.     The substance purchased from INGRAM and M. JACKSON was subsequently

---

[7]The identification of M. JACKSON in this Affidavit is based upon the following: First, UCE1 has identified M. JACKSON after viewing an Illinois Driver's License photograph of M. JACKSON. Second, law enforcement has been able to identify M. JACKSON's voice because that voice was consensually recorded during telephone calls with UCE1 and was intercepted during wire intercepts on **Target Phone 1** and **Target Phone 2**. During these recorded phone conversations, M. JACKSON has identified himself in many of these calls with his first name, "MARTEL," or the same alias names "CHEETAH" or "O'SHEA," and because the voice was consistently associated with **Target Phone 1** and **Target Phone 2**, as well as phone numbers provided to UCE1 during recorded controlled drug purchases.

13

submitted to the DEA Crime Lab for analysis, which showed the substance was 5.8 grams

of cocaine base. Based upon your Affiant's experience, the white rock like appearance of

the substance bought, and the lab results, your Affiant believes the substance bought from

INGRAM was crack cocaine.

### (4)   Controlled Purchase on December 8, 2006 from INGRAM and M. JACKSON

27.     On December 8, 2006, UCE1 called INGRAM at Ingram Phone A. During this

conversation, UCE1 told INGRAM s/he had "4" ($400). After confirming that UCE1 wanted

"400" ($400 worth of crack cocaine), INGRAM told UCE1 to meet him at the "same spot"

(liquor store parking lot), and he would call UCE1 as soon as his ride (transportation) picked

him up. UCE1 was provided $400 in official funds and dropped off near the area of the

liquor store parking lot. UCE1 then walked on foot to the liquor store. While at this location,

UCE1 received a phone call, which was partially recorded,  from M. JACKSON. M.

JACKSON then told UCE1 that they were on their way and should be there in 20 to 25

minutes. At approximately 1:00 p.m., surveillance saw a black Cadillac pull into the parking

lot area. During this transaction, which was recorded, UCE1 walked up to the rear passenger

seat of the vehicle where INGRAM was sitting. After handing INGRAM the $400 and after

INGRAM asked if it was "4," INGRAM gave UCE1 a clear plastic bag of a hard white

substance that UCE1 believed was  crack cocaine. Before leaving the location, UCE1

noticed that INGRAM had three large stacks of money on his lap. UCE1 also noticed that

M. JACKSON was sitting in the front passenger seat of the vehicle talking on the phone.

14

28.     The substance purchased from INGRAM and M. JACKSON was subsequently submitted to the DEA Crime Lab for analysis, which showed that the substance was 6.1 grams of cocaine base. Based upon your Affiant's experience, the hard white appearance of the substance bought, and the lab results, your Affiant believes the substance bought from INGRAM was crack cocaine.

### (5)     Controlled Purchase on December 18, 2006 from INGRAM and M. JACKSON

29.     On December 18, 2006, UCE1 called INGRAM at Ingram Phone A. During this conversation, which was recorded, INGRAM asked UCE1 what s/he was trying to get. UCE1 said s/he wanted the "same" ($400 worth of crack cocaine). INGRAM then told UCE1 to call M. JACKSON at 630-328-6550 and ask for "CHEETAH" (M. JACKSON). UCE1 then called M. JACKSON at 630-328-6550. During this call, which was recorded, UCE1 told M. JACKSON that s/he wanted "4" and asked M. JACKSON if s/he could get a "little more on that" (more crack cocaine for the same price). After JACKSON told UCE1 that he would take care of him/her, they both agreed to meet at the same liquor store parking lot.

30.     UCE1 was provided with $400 in undercover funds and was dropped off near the liquor store parking lot. While walking to the parking lot, UCE1 received a phone call, which was partially recorded, from M. JACKSON, who said he was already there in the lot. UCE1 then noticed a black Cadillac parked at this location. During this transaction, which was recorded, UCE1 walked toward the Cadillac where M. JACKSON was standing outside

15

of the front passenger side door. Surveillance saw M. JACKSON walk up to the driver's side window, knock on the window, and the unidentified female driver then "popped" open the gas tank cover. UCE1 saw M. JACKSON take a clear plastic bag of a white rock like substance that UCE1 believed was crack cocaine from this area and then give the bag to UCE1. After giving M. JACKSON the money, M. JACKSON told UCE1 to make sure s/he stored the number s/he just called since "they" (M. JACKSON and INGRAM) were starting to change their numbers.[8]

31.    The substance purchased from INGRAM and M. JACKSON was subsequently submitted to the DEA Crime Lab for analysis, which showed that the substance was 5.8 grams of cocaine base. Based upon your Affiant's experience, the fact that UCE1 asked for "same," the white rock like appearance of the substance bought, and the lab results, your Affiant believes the substance bought from INGRAM and M. JACKSON was crack cocaine.

### (6)    Controlled Purchase on January 5, 2007 from INGRAM

32.    On January 5, 2007, UCE1 called INGRAM at telephone number (630) 201-9761. After leaving a couple of messages, UCE1 then called INGRAM at telephone number (630) 201-9711 (hereinafter "Ingram Phone B"). During this conversation, which was recorded, INGRAM asked what UCE1 was trying to get, and UCE1 told INGRAM that s/he

---

[8] On December 18, 2006 after this controlled drug buy, M. JACKSON was arrested by the APD for Illegal Possession of a Controlled Substance, Manufacturing and Delivering a Controlled Substance, and Unlawful Delivery of a Controlled Substance. The arrest took place at 216 Fordhan Avenue, Aurora, Illinois. When arrested, M. JACKSON was using the same black Cadillac that he had used during the drug transaction with the UCE1. On January 31, 2007 M. JACKSON was released after posting bond.

wanted "400" ($400 worth of crack cocaine). INGRAM and UCE1 then agreed to meet at the liquor store parking lot in about 20 to 25 minutes. UCE1 was provided $400 in undercover funds and was dropped off near the liquor store parking lot area. While UCE1 walked to this location, s/he noticed that INGRAM was already there sitting in a tan Chevrolet Impala . During this transaction, which was recorded, UCE1 walked up to the Impala and got inside the back seat. After receiving a plastic bag from INGRAM containing a white rock like substance that UCE1 believed was crack cocaine . and after giving INGRAM the money, UCE1 asked if s/he could get a better price if s/he ordered more crack cocaine. INGRAM then told UCE1 to call him and that they would then talk about it.

33.    The substance purchased from INGRAM was subsequently submitted to the DEA Crime Lab for analysis, which showed that the substance was 3.6 grams of cocaine base. Based upon your Affiant's experience, the off white rock like appearance of the substance bought, and the lab results, your Affiant believes the substance bought from INGRAM was crack cocaine.

### (7)  Controlled Purchase on January 16, 2007 from INGRAM

34.    On January 9, 2007, UCE1 called INGRAM on Ingram Phone B. During their conversation, which was recorded, UCE1 and INGRAM discussed the possibility of UCE1 buying a half ounce of crack cocaine. At the conclusion of the conversation, INGRAM told UCE1 that a half an ounce would cost him/her $550.

35.    On January 16, 2007, UCE1 called INGRAM at Ingram Phone B. During this conversation, which was recorded, UCE1 asked if it was still possible to get that "half" (half

17

ounce of crack cocaine). When INGRAM said it was possible and after INGRAM confirmed that UCE1 had "550" ($550), INGRAM told UCE1 that he could meet at the liquor store parking lot in about 20 minutes.

36.     UCE1 was provided $550 in undercover funds and was dropped off near the area of the liquor store parking lot. UCE1 then walked to the liquor store parking lot and waited for INGRAM to arrive.   During the transaction, which was recorded,   at approximately 3:57 p.m. INGRAM arrived at the parking lot and backed into a parking space on the west side of the building. UCE1 then entered the vehicle on the front passenger side, and once inside, UCE1 watched as INGRAM retrieved a clear plastic bag of a white rock like substance that UCE1 believed was crack cocaine from the dash board area of the vehicle. After INGRAM handed UCE1 the plastic bag, UCE1 gave INGRAM the $550. UCE1 then got out of the vehicle, and INGRAM, who was the only one in the vehicle during this time, drove away from the area.

37.     The substance purchased from INGRAM was subsequently submitted to the DEA Crime Lab for analysis, which showed that the substance was 9.9 grams of cocaine base. Based upon your Affiant's experience, the white rock like appearance of the substance bought, and the lab results, your Affiant believes the substance bought from INGRAM was crack cocaine.

### (8)     Controlled Purchase on January 25, 2007 from INGRAM

38.     On January 25, 2007, UCE1 called INGRAM at Ingram Phone B. During this conversation, which was recorded, UCE1 told INGRAM that s/he was looking to get a "half"

18

(half ounce of crack cocaine) and that s/he had "550" ($550). INGRAM then told UCE1 to give him about 45 minutes since he was getting pulled over by the police at that time.[9]

39.    UCE1 was provided $550 in undercover funds and was then dropped off near the area of the liquor store parking lot. UCE1 then walked on foot to this location and waited for INGRAM to arrive. While at the liquor store, UCE1 received a phone call, which was partially recorded, from INGRAM, who asked UCE1 if s/he was already there. When UCE1 told INGRAM that s/he was there waiting, INGRAM told UCE1 that he would be there in about 5 minutes. At approximately 6:53 p.m., a tan Chevrolet Impala arrived and parked in the lot. During the transaction, which was recorded, UCE1 entered the rear passenger seat since an unknown black female was sitting in the front passenger seat next to INGRAM, who was driving. Once inside the vehicle, UCE1 handed INGRAM the $550, and INGRAM handed UCE1 a clear plastic bag containing a white rock like substance that UCE1 believed was crack cocaine. After receiving the plastic bag, INGRAM asked UCE1 if the money amount was "550" before UCE1 exited the vehicle.

40.    The substance purchased from INGRAM was subsequently submitted to the DEA Crime Lab for analysis, which showed that the substance was 9.5 grams of cocaine base. Based upon your Affiant's experience, the white rock like appearance of the substance bought, and the lab results, your Affiant believes the substance bought from INGRAM was crack cocaine.

---

[9] APD records reflect that INGRAM was stopped in the area of Randall Road and Galena Boulevard by a marked patrol unit at approximately 5:53 p.m. At that time, INGRAM was driving a tan Chevy Impala, which is the same vehicle he later drove to the buy location.

### (9)    Attempted Controlled Purchase on February 6, 2007 from INGRAM and M. JACKSON

41.    At approximately 5:49 p.m., UCE1 placed a call to Ingram Phone B. During the conversation, which was recorded, M. JACKSON answered the phone instead of INGRAM, and asked what UCE1 needed. When UCE1 told M. JACKSON that s/he needed the same "5 ½" ($550 worth of crack cocaine), M. JACKSON asked where UCE1 was at. Because UCE1 initially thought that s/he was talking to INGRAM, s/he told M. JACKSON that s/he was going to be over there again. After M. JACKSON asked where and after UCE1 tried to tell him the liquor store, M. JACKSON then told UCE1 that he was INGRAM's brother, so UCE1 had to give him better directions. After UCE1 mentioned Batavia (referring to prior transactions which had occurred between M. JACKSON and UCE1 in Batavia, ¶¶, 23-31), M. JACKSON seemed to remember who UCE1 was and asked UCE1 what s/he had for him. UCE1 then told M. JACKSON that s/he had "5 ½" ($550) and asked JACKSON if it was going to be a good "half" (half ounce of crack cocaine) since the last one (referring to the January 25, 2007, purchase ¶¶, 38-40) was a little "light" (weighed less than a half ounce)? M. JACKSON then told UCE1 that he would call him/her when he was about there, but asked UCE1 to give him about a half an hour to get there. [10]

42.    After UCE1 was provided with $550 in undercover funds, UCE1 called M. JACKSON back on Ingram Phone B while UCE1 was waiting at the liquor store. During the

---

[10] Although M. JACKSON was in custody for several weeks after his December 18, 2006 arrest by the Aurora Police Department, JACKSON was released from jail on January 31, 2007 after posting bond.

conversation, which was partially recorded, M. JACKSON told UCE1 that he had almost forgot about him/her, but he also assured UCE1 that even though he had some things to take care of, he was on Farnsworth Avenue right now. After M. JACKSON told UCE1 that it would still be a while before he arrived since he was coming from the other side of Aurora. UCE1 then told M. JACKSON that s/he was going to walk down to McDonald's, so when M. JACKSON was close, he should call UCE1.

43. At approximately 6:59 p.m., UCE1 received a phone call from Ingram Phone B. UCE1 believed INGRAM was the caller at this time. During the conversation, which was partially recorded, INGRAM told UCE1 that he was probably ten minutes away, but he might need a little more time with the snow on the roads. After receiving this phone call, UCE1 walked back to the liquor store parking lot to wait for INGRAM and or M. JACKSON to arrive. Once at this location at approximately 7:10 p.m., UCE1 received a phone call, which was partially recorded, from M. JACKSON this time, who asked if UCE1 was at the liquor store.

44. At approximately 7:11 p.m., surveillance saw a tan colored Pontiac, license number 7624467, pull into the liquor store parking lot.[11] The vehicle driven by a black male pulled up to UCE1, who then got inside the back passenger seat of the vehicle. UCE1 was not able to get a good look at the face of the black male driver but later learned that the driver

---

[11] According to the Illinois Secretary of State's Office, license number 7624467, was registered to Individiual A and Co-Conspirator A, 826 North May Street, Aurora, Illinois 60506, on a 2004 Pontiac.

was M. JACKSON.[12] M. JACKSON then drove the vehicle out of the parking lot. When UCE1 asked where they were going, the driver told UCE1 that they were just going over to the White Hen, which was located nearby.

45.    While heading toward the White Hen location, M. JACKSON asked UCE1 where s/he had been lately. UCE1 then asked M. JACKSON what he meant by that since s/he had been buying from INGRAM every other week. Before UCE1 could finish answering this question, the driver then asked why UCE1 was always walking. UCE1 then tried to explain that s/he was walking because s/he had a revoked driver's license due to a DUI arrest. When nothing else was said, UCE1 asked the driver if everything was good, and M. JACKSON simply responded back by saying, "I'm good."

46.    Later in the conversation, UCE1 asked if "he" (person with the drugs) was coming up here. The driver (M. JACKSON) of the vehicle then drove past the liquor store traveling eastbound on Wilson Street before turning southbound on Raddant Road. During the drive, UCE1 kept asking where they were going, and all M. JACKSON would say was that he was waiting on "him" (INGRAM) to come out here since M. JACKSON was told to pick up UCE1 at the liquor store. At this point, UCE1 asked who they were waiting on, and M. JACKSON told UCE1 that the person they were waiting on was the person that UCE1 had just called. UCE1 confirmed that they were talking about INGRAM. The vehicle pulled into a driveway located at 442 Raddant Road. After sitting at this location and not getting

---

[12]In a conversation on March 9, 2007, M. JACKSON identified himself as the driver who had picked up UCE1 on February 16, 2007. (*See* ¶ 69)

out of the vehicle, M. JACKSON pulled back out continued southbound on Raddant Road before turning westbound on Pine Street. When UCE1 asked where the driver was going now, M. JACKSON said he was trying to figure out where "he" (INGRAM) was at. When M. JACKSON made another turn southbound on Hart Road, UCE1 was able to get out of the vehicle.

**(10)    February 17, 2007, INGRAM Provided UCE1 with Phone Number to Target Phone 1**

47.    On February 17, 2007, at approximately 12:45 p.m., UCE1 received a phone call from a restricted number (the phone number does not appear on caller ID). When UCE1 answered the phone, s/he asked who the caller was. The caller then identified himself as "D" (INGRAM) and told UCE1 that he wanted to begin by apologizing to him/her. INGRAM then went on and told UCE1 that "his brother" (referring to M. JACKSON) was really cautious and was really smart, which is why when he saw the Jeep he thought someone was following him.[13] INGRAM then told UCE1 that s/he had to understand his position, but that he and his brother were good people, who got thrown into this "business" (selling drugs) because of where they lived. INGRAM then changed the subject and told UCE1 that he had heard s/he had met one of his guys, "Antonio."

48.    INGRAM then asked UCE1 if s/he knew anyone in Batavia. After telling INGRAM that s/he "messed" with (had purchased drugs from) a few people in Batavia,

---

[13] INGRAM is referring to the attempted controlled buy operation that occurred on February 6, 2007 where the driver, who picked up UCE1, saw a Jeep following him.

INGRAM asked UCE1 if s/he dealt with a tall guy, who was driving a white SUV. When UCE1 said that a guy s/he had messed with recently went by the name of "Red," INGRAM told UCE1 that "Red" had told him that UCE1 was "straight," which was why INGRAM was calling UCE1 to apologize.[14]

49.     INGRAM then asked  UCE1 if s/he might call INGRAM for "something" (crack cocaine). After UCE1 indicated that s/he might, INGRAM asked when? UCE1 told INGRAM that s/he might call him back next week. INGRAM and UCE1 talked some more about what happened the last time. UCE1 told INGRAM that s/he had jumped out of the vehicle because s/he thought they were going to rob him/her. INGRAM then told UCE1 that they did not do things like this, and that the next time, things were going to be different. INGRAM then called UCE1 right back from telephone number (630) 201-9914.[15] INGRAM then told UCE1 to store this number in his/her phone, and that UCE1 should call this number from now on. [16]

50.     At approximately 5:45 p.m., INGRAM called UCE1 from **Target Phone 1,**[17]

---

[14]On February 16, 2007, during an unrelated investigation, UCE1 purchased $100 worth of crack cocaine from "Red" at a Shell Gas Station located on the corner of Butterfield Road and Farnsworth Avenue. UCE1 at that time identified "Red" as A. JACKSON after viewing an Illinois Department of Motor Vehicle photograph of JACKSON.

[15] Phone number (630) 201-9914 was subscribed to Jamie Jazz, 1243 East New York Street, Aurora, Illinois 60505.

[16] Because UCE1 was off duty and because s/he did not have any recording devices available to him/her, this particular phone call was not recorded.

[17] In each instance in which UCE1 received a call from **Target Phone 1**, UCE1 was able to recognize that the call was coming from **Target Phone 1** using UCE1's cell phone's caller ID.

on UCE1's cell phone. When UCE1 answered, INGRAM told UCE1 to store the number

on his caller ID (**Target Phone 1**) since this was the number INGRAM wanted UCE1 to call

him on. INGRAM then told UCE1 that one of his guys got arrested, so he was not too happy

with all the "bullshit" that was going. INGRAM then told UCE1 to get rid of all of his other

phone numbers because he was no longer using them. INGRAM then ended the conversation

by telling UCE1 to call him when s/he was "ready".[18]

### (11) February 21, 2007 Controlled Purchase from INGRAM and A. JACKSON

51.    At approximately 7:00 p.m., UCE1 contacted INGRAM on **Target Phone 1**.

During the conversation, which was recorded, UCE1 asked INGRAM if they were going to

be able to meet up tonight. When INGRAM asked UCE1 what s/he was trying to get, UCE1

told INGRAM s/he wanted the "550" ($550 worth of crack cocaine). UCE1 and INGRAM

then agreed to meet at the North Aurora Target store parking lot to do the deal. INGRAM

told UCE1 that he might have "Red" (A. JACKSON) bring it out to him/her.[19] After UCE1

provided INGRAM with a description of his/her vehicle, INGRAM told UCE1 that he would

---

[18] Because UCE1 was off duty and because s/he did not have any recording devices available to him/her, this particular phone call was not recorded.

[19]The identification of A. JACKSON in this Affidavit is based upon the following: First, UCE1 has identified A. JACKSON from an Illinois Driver's License photograph. Second, law enforcement has been able to identify A. JACKSON's voice because his voice was consensually recorded during telephone calls between A. JACKSON and UCE1; because A. JACKSON has identified himself in many of those calls with the same alias name ("Red"), and because the voice was consistently associated with the phone number provided by A. JACKSON to UCE1. Third, during particular consensual phone calls, A. JACKSON arranged to personally meet with UCE1, and these meetings were subsequently monitored by surveillance units.

call him/her back in 10 minutes. UCE1 was then given $550 in undercover funds and began driving to the North Aurora Target store. At approximately 7:20 p.m., while driving to this location, UCE1 received a phone call, which was partially recorded, from **Target Phone 1**. INGRAM then asked UCE1 where s/he was at? After UCE1 told INGRAM s/he was driving to North Aurora now, INGRAM told UCE1 to call "Red" (A. JACKSON).

52.    At approximately 7:28 p.m., UCE1 called A. JACKSON at telephone number (630) 273-5438.[20] (hereinafter referred to as A. Jackson Phone A). During this phone call, which was partially recorded, and when A. JACKSON answered the phone, UCE1 told A. JACKSON that s/he had just talked to "D" and that s/he was going to the North Aurora Target store. Although A. JACKSON wanted to meet UCE1 at the Batavia Apartments, he agreed to meet UCE1 at the North Aurora Target after confirming the price was $550.

53.    At approximately 8:11 p.m., surveillance saw a white Chevy Blazer, temporary license number 961G089, pull into the parking lot and park right next to UCE1's vehicle. UCE1 then walked over to the driver's side window and saw A. JACKSON reach to the back of his pants and pull out a plastic bag containing a white rock like substance that UCE1 believed was crack cocaine. After UCE1 gave A. JACKSON the $550, A. JACKSON handed UCE1 the plastic bag. Before A. JACKSON left, UCE1 asked if he was "D's" (INGRAM'S) buddy? When A. JACKSON said he was, UCE1 asked if s/he should call INGRAM or him, and A. JACKSON told UCE1 to call him the next time.

---

[20] Phone number (630) 273-5438 is subscribed to A. JACKSON, 1291 East Wilson Street #306, Batavia, Illinois 60510-2247.

54.    The substance purchased from INGRAM and A. JACKSON was subsequently submitted to the DEA Crime Lab for analysis, which showed that the substance was 5.4 grams of cocaine base.    Based upon your Affiant's experience, the white rock like appearance of the substance bought, and the lab results, your Affiant believes the substance bought from INGRAM and A. JACKSON was crack cocaine.

55.    At approximately 8:56 p.m., UCE1 called A. JACKSON at A. Jackson Phone A. During this conversation, which was recorded, UCE1 asked A. JACKSON if INGRAM had told him what UCE1 was getting. When A. JACKSON claimed he did not know, UCE1 complained that the "shit" (crack cocaine) that he received for $550 was so "light" ( underweight) since it was barely over "7" (grams).[21]    After A. JACKSON heard this, he told UCE1 that s/he should have dealt with him (A. JACKSON).    UCE1 then told A. JACKSON that s/he was going to call INGRAM to complain and would call A. JACKSON in the future.

56.    At approximately 9:08 p.m., UCE1 received a phone call from A. JACKSON Phone A.    During this phone conversation, which was recorded, UCE1 asked A. JACKSON if he could get him/her a good "full one" (one ounce of crack cocaine) for "9 to 9 1/2" ($900 to $950).    After A. JACKSON assured UCE1 that he could get that for UCE1, UCE1 again told A. JACKSON that if he came at him/her with a good "full one," UCE1 would definitely come at A. JACKSON with "9 1/2" ($950).    A. JACKSON then told UCE1 to just call him when s/he was ready.

---

[21] During this phone conversation, UCE1 is complaining about the 7 grams of crack cocaine s/he received since for $550, UCE1 was supposed to have received a "half" (half ounce of crack cocaine), which should have weighed close to 14 grams.

27

(12)    **February 27, 2007 Controlled Purchase from A. JACKSON and INGRAM**

57.    On February 27, 2007, at approximately 12:45 p.m., UCE1 called **Target Phone 1**. During the conversation, which was recorded,  INGRAM answered, and  UCE1 asked INGRAM if he was going to be good for that "full one" (18 to 22 grams of crack cocaine that they had previously discussed)? When INGRAM asked UCE1 when s/he would be ready, UCE1 told INGRAM that s/he got off work around 4:00 p.m., so s/he would call INGRAM when s/he got back to Batavia.  INGRAM then confirmed UCE1's order and also confirmed that UCE1 was going to be "mobile" since that made things a lot easier.

58.    At approximately 3:41 p.m., UCE1 called **Target Phone 1**.  During the conversation, which was recorded,  INGRAM answered the phone, and UCE1 asked if he was going to be ready shortly.  INGRAM and UCE1 then agreed to meet back at the Target store in North Aurora in about 20 minutes.  After UCE1 was provided with $950 in undercover funds, UCE1 drove to the Target store parking lot arriving at approximately 4:05 p.m. While at this location, UCE1 received a phone call from **Target Phone 1**.  During the conversation, which was partially recorded, INGRAM told UCE1 that he wanted him/her to drive to the Walgreens located on the corner of Indian Trail and Randall Road in Aurora. After UCE1 gave excuses why s/he could not go to this location, INGRAM agreed to start heading that way.

59.    At approximately 4:33 p.m., UCE1 called **Target Phone 1** and spoke to INGRAM.  During the conversation, which was partially recorded,  INGRAM told UCE1

that he had given "it" (crack cocaine) to "Red" (A. JACKSON), and that A. JACKSON

should be driving over in the white truck. At approximately 4:43 p.m., surveillance saw a

white Chevy Blazer arrive at the North Aurora Target store and park next to UCE1's vehicle.

During the transaction, which was recorded, UCE1 walked up to the Blazer and noticed that

A. JACKSON had a plastic bag containing a hard white substance that UCE1 believed was

crack cocaine in a plastic bag sitting on the seat. UCE1 then produced his/her drug scale and

told A. JACKSON to put the crack cocaine on the scale. When UCE1 saw that it only

weighed 15.8 grams and after telling A. JACKSON that s/he was not going to pay "950"

($950) for that, A. JACKSON asked UCE1 to call INGRAM on his phone since A.

JACKSON told UCE1 that he was out of minutes. When UCE1 called **Target Phone 1** and

INGRAM answered, s/he told INGRAM that s/he was out with A. JACKSON now and that

it only weighed "15". INGRAM then asked to speak to A. JACKSON, and after they talked,

A. JACKSON told UCE1 that it was supposed to be "18" (18 grams of crack cocaine). When

UCE1 got the phone back and was talking to INGRAM, he tried to tell UCE1 that his/her

scale was not working right. UCE1 assured INGRAM the scale was working properly, and

then offered to buy the "15" for "7 ½" ($750). When INGRAM tried to negotiate a price of

"850" ($850) and when UCE1 would only go up to "8" ($800), INGRAM told UCE1 to give

"it" (crack cocaine) back to A. JACKSON, which UCE1 did.

      60.     At approximately 5:26 p.m., UCE1 received a phone call from A. JACKSON,

A. Jackson Phone A. During the conversation, which was recorded, A. JACKSON told

UCE1 that "he" (INGRAM) was going to add some more to the bag and was then going to

call UCE1 back.  When UCE1 asked if A. JACKSON was going to be the one to come back out, A. JACKSON said that he more than likely would be the one bringing "it" (crack cocaine).  UCE1 then told A. JACKSON to just give him/her a call.

61.    At approximately 5:30 p.m., UCE1 placed a call to **Target Phone 1** and spoke to INGRAM.  During the conversation, which was recorded, INGRAM asked where UCE1 was at?  After giving INGRAM a location,  INGRAM told UCE1 that he would call him/her back in a second because he was planning on meeting up with UCE1.

62.    At approximately 5:35 p.m., surveillance went back to the area of the North Aurora Target store and Woodman's grocery store to wait for INGRAM or A. JACKSON to arrive.  While at this location, at approximately 6:05 p.m., UCE1 called INGRAM on **Target Phone 1**.  During the conversation, which was partially recorded , INGRAM asked where UCE1 was at.  After giving INGRAM his/her location, UCE1 asked if A. JACKSON was coming over to this location.  INGRAM then ended the conversation by telling UCE1 that his/her "calculator" (drug scale) was wrong.

63.    At approximately 6:15 p.m., A. JACKSON called UCE1 from phone number A. Jackson Phone A, to confirm where UCE1 was located.  During the conversation, which was partially recorded, UCE1 told A. JACKSON that s/he was over at the North Aurora Target.  UCE1 then  received a phone call from **Target Phone 1**, which was also partially recorded.  INGRAM then verified that UCE1 had spoken to A. JACKSON, and UCE1 told INGRAM that they were going to meet at the Target store.

64.    At  approximately  6:20  p.m.,  A. JACKSON  called  UCE1.   During  the

conversation, which was partially recorded, A. JACKSON asked him/her to meet at the Walmart store in Batavia. UCE1 told A. JACKSON that s/he was in North Aurora right now, so it would take a little while to get there. Surveillance then headed toward this location.

65.    At approximately 6:38 p.m., UCE1 arrived at the Batavia Walmart. Surveillance units had already spotted A. JACKSON's white Chevy Blazer parked on the north end of the parking lot. During the transaction, which was recorded, UCE1 parked his/her vehicle next to A. JACKSON and walked up to the driver's side window where A. JACKSON had a scale sitting on the center console with a plastic bag of a white rock like substance that UCE1 believed was crack cocaine on top of the scale. After seeing the weight, UCE1 gave A. JACKSON the $950, and A. JACKSON gave UCE1 the bag of crack cocaine.

66.    The substance purchased from INGRAM and A. JACKSON was subsequently submitted to the DEA Crime Lab for analysis, which showed that the substance was 14.8 grams of cocaine base. Based upon your Affiant's experience, the white rock like appearance of the substance bought, and the lab results, your Affiant believes the substance bought from INGRAM and A. JACKSON was crack cocaine.

**(13)    March 9, 2007 Controlled Purchase from INGRAM and M. JACKSON**

67.    At approximately 1:53 p.m., UCE1 called **Target Phone 1** and spoke to INGRAM. During the conversation, which was recorded, UCE1 asked INGRAM if he was going to be "good here" (ready to sell drugs to UCE1). After INGRAM told UCE1 that he was good right now, UCE1 asked if INGRAM wanted to meet at the Target store parking

31

lot located in North Aurora, Illinois. INGRAM then asked UCE1 if s/he could make it to Farnsworth Avenue by the El Burrito Loco in Aurora. INGRAM asked UCE1 what s/he was going to need? When UCE1 said s/he wanted the same, "950" ($950 worth of crack cocaine), INGRAM told UCE1 that he would give him/her "20 G's" (20 grams of crack cocaine) for that amount.

68.    At approximately 2:25 p.m., UCE1 was in the area of the El Burrito Loco Restaurant after UCE1 had been given $950 in undercover funds. As soon as UCE1 arrived at this location, s/he called **Target Phone 1**. During this phone call, which was partially recorded, UCE1 told INGRAM s/he was at the restaurant parking lot. INGRAM then told UCE1 that he would be right there. At approximately 2:41 p.m. while UCE1 was still sitting at this same location, UCE1 received another phone call, which was partially recorded, from **Target Phone 1**. INGRAM then told UCE1 that he was coming up Farnsworth Avenue right now. UCE1 then relayed this information to all of the surveillance units.

69.    At approximately 2:51 p.m., surveillance saw a gold colored Pontiac Grand Am pull into the parking lot. During this transaction, which was recorded, M. JACKSON got out of the vehicle and entered the front passenger seat of UCE1's vehicle. Once inside, M. JACKSON asked UCE1 if s/he remembered him because he was the one who was driving him/her around.[22] After UCE1 produced his/her scale, M. JACKSON pulled out a plastic bag

---

[22] M. JACKSON is admitting to UCE1 that he was the black male on February 6, 2007, who picked up UCE1 at the liquor store in Batavia and drove him around during the attempted controlled buy on that date.

containing a white rock like substance that UCE1 believed was crack cocaine and placed the item on the scale. After UCE1 looked at the weight and said it was good enough for him/her, UCE1 gave M. JACKSON the $950. As M. JACKSON was getting out of the vehicle, he told UCE1 to drive safe and wear his/her seatbelt, so UCE1 would not get pulled over by the police. After getting into the gold Pontiac, surveillance watched as M. JACKSON and an unknown female driver drove around the parking lot looking at all of the vehicles in the area before leaving southbound on Farnsworth Avenue.

70.    At approximately 2:55 p.m., while UCE1 was attempting to pull away from the meet location, s/he received another phone call, which was partially recorded, from **Target Phone 1**. INGRAM at that time called to make sure everything was good. INGRAM also asked how "his brother" (M. JACKSON) had treated UCE1 because he wanted to make sure everything was ok between UCE1 and M. JACKSON.

71.    The substance purchased from INGRAM and M. JACKSON was subsequently submitted to the DEA Crime Lab for analysis, which showed that the substance was 18.3 grams of cocaine base. Based upon your Affiant's experience, the white rock like appearance of the substance bought, and the lab results, your Affiant believes the substance bought from INGRAM and M. JACKSON was crack cocaine.

**B.    Controlled Purchase from M. JACKSON**

**(1)    March 19-20, 2007 Consensual Phone Calls and Controlled Purchase from M. JACKSON**

72.    At approximately 9:44 a.m., March 19, 2007, UCE1 received a voice mail

message, which was recorded, from **Target Phone 1**. Although the caller identified himself as "Your Boy D," UCE1 recognized the voice as belonging to M. JACKSON. Further, UCE1 had been informed by law enforcement that INGRAM was then in custody.[23] M. JACKSON then left a message asking UCE1 to call him back as soon as s/he possibly could, so he could talk to UCE1 about what was going on.

73.     At approximately 1:24 p.m., March 19, 2007, UCE1 called **Target Phone 1.** During the conversation, which was recorded, M. JACKSON told UCE1, "Things were really fucked up out here, and that it was worse then before." When UCE1 asked what was going on, M. JACKSON said, "The only thing fucked up right now was the prices." M. JACKSON then told UCE1 that the prices had gone up a little bit, which is why he was giving UCE1 a call. M. JACKSON then told UCE1 that he would give UCE1 "24" (grams of crack cocaine) for "12" ($1,200). When UCE1 verified the "12," M. JACKSON confirmed and said that was how bad it was. After agreeing on the price, UCE1 told M. JACKSON that s/he would probably be calling him the next day between 2:00 and 2:30 p.m. M. JACKSON then told UCE1 that he would be waiting on UCE1's call, and that he would have UCE1's "order" (24 grams of crack cocaine) ready.

74.     At approximately 1:20 p.m., March 20, 2007, M. JACKSON called UCE1 from **Target Phone 1**. During this conversation, which was recorded, M. JACKSON and UCE1

---

[23] On March 14, 2007, INGRAM was arrested by the Aurora Police Department for Armed Violence, Aggravated Discharge of a Firearm, and Aggravated Unlawful Use of a Weapon. INGRAM was in custody on the date of this phone call because he was unable to post the $850,000 bond. Recovered at that time was a Winchester Pump Action .22 caliber Rifle, that had a sawed off barrel, that was used by INGRAM during this incident.

agreed to meet at El Burrito Loco where they met on March 9, 2007. UCE1 was given $1,200 in undercover funds and began driving to El Burrito Loco restaurant. While driving to this area, UCE1 received a phone call, which was partially recorded, from **Target Phone 1.** M. JACKSON then asked UCE1 where s/he was at. When UCE1 told M. JACKSON his/her current location, M. JACKSON told UCE1 that he was already there, so he was going to "roll the block a couple of times".

75.    At approximately 2:15 p.m., March 20, 2007, UCE1 arrived in the area of the El Burrito Loco Restaurant. While at this location, UCE1 attempted to call **Target Phone 1** four times, however M. JACKSON did not answer. At approximately 2:25 p.m., UCE1 called **Target Phone 1**, which was partially recorded, and M. JACKSON answered. UCE1 told M. JACKSON s/he was at the parking lot.

76.    At approximately 2:28 p.m., March 20, 2007, surveillance saw M. JACKSON arrive in a gold colored Pontiac and pull up next to UCE1's vehicle. During the transaction, which was recorded, UCE1 got out of his/her vehicle and walked up to M. JACKSON. M. JACKSON then told UCE1 to drive around to the other side of the parking lot because they were out in the open. After driving to the north side of the shopping plaza parking lot, UCE1 walked up to M. JACKSON'S vehicle. M. JACKSON then handed UCE1 a plastic bag containing a white rock like substance that UCE1 believed was crack cocaine and told UCE1 to put that on his/her "calculator" (drug scale). UCE1 then handed M. JACKSON the $1,200. During the transaction, M. JACKSON also told UCE1 that "his brother" (INGRAM)

35

was really busy lately, which is why he did not come out to deal with UCE1 himself.[24]

77.     The substance purchased from  M. JACKSON on March 20, 2007, was subsequently submitted to the DEA Crime Lab for analysis, which showed that the substance was 21.3 grams of cocaine base.  Based upon your Affiant's experience, the white rock like appearance of the substance bought, and the lab results, your Affiant believes the substance bought from M. JACKSON was crack cocaine.

> **(2)     April 2, 2007  Consensual Phone Call with UCE1 and M. JACKSON**

78.     On April 2, 2007, at approximately 5:05 p.m., UCE1 called **Target Phone 1** and spoke to M. JACKSON.  During the call, which was recorded, M. JACKSON asked if UCE1 had been up in Elgin.  When UCE1 told M. JACKSON that s/he had not been in Elgin and the s/he was in Batavia,  M. JACKSON told UCE1 that somebody had described UCE1 and that person said that UCE1 was "EPD" (Elgin Police Department).  After hearing this, UCE1 denied this accusation and told M. JACKSON that they had been through this already. M. JACKSON then told UCE1, "It sucked to hear such a thing and that was not good." UCE1 agreed with M. JACKSON and told M. JACKSON , "It sucked being accused of that every time."

79.     M. JACKSON then told  UCE1 that he had heard his/her side of the story, and that they had been cool and straight for a while now, so M. JACKSON wanted to keep it that

---

[24] M. JACKSON was talking about INGRAM, who was still in custody on the date of this transaction.

way.  When  UCE1 told M. JACKSON that "this shit" was not happening again, M.

JACKSON assured UCE1 that the next time he would come out himself.  M. JACKSON then

asked UCE1 if s/he had any complaints about the last "batch" (crack cocaine).[25]  When UCE1

said s/he did not and asked why, M. JACKSON told UCE1 that "the shit sucked".  UCE1

then tried to explain to M. JACKSON that s/he did not "do it" (use crack cocaine)

himself/herself, and where s/he lived "those people" (drug users) are always wanting to get

"it" (crack cocaine).  M. JACKSON then asked where UCE1 lived, and UCE1 explained that

s/he lived in Waterman (Illinois), which was way west of Sugar Grove.

80.    M. JACKSON then told UCE1 to give him a call tomorrow, and asked UCE1

what s/he was going to need because the "shit" (crack cocaine) was better now.  When UCE1

asked how the prices were because s/he had paid "12" ($1,200) the last time, M. JACKSON

told UCE1 that the prices were still the same depending on what UCE1 wanted and what

UCE1 needed.  UCE1 then told M. JACKSON that s/he would probably get the "12," and

M. JACKSON agreed that it was better since s/he did not have to get out so much.[26]

**C.    Title III Calls and Seizures involving M. JACKSON and some of his Co-Conspirators including C. JACKSON, Co-Conspirator B, Co-Conspirator A, and MOSBY**

---

[25] When M. JACKSON asked if UCE1 had any complaints about the "last batch," M. JACKSON was referring to the crack cocaine UCE1 purchased from M. JACKSON on March 20, 2008.

[26] After this phone call between M. JACKSON and UCE1, UCE1 had no additional physical contact with M. JACKSON due to officer safety concerns.

**(1)    Call Activity May 17, 2005 between M. JACKSON and "Bishop"**

81.    On May 17, 2007, at approximately 8:29 a.m., Call 585 (**Target Phone 1**), a male, "Bishop," who was previously identified as "Bishop," called **Target Phone 1** from (773) 256-7823. When M. JACKSON answered the phone, Bishop told M. JACKSON, "He got it cracking for the 13th for you all." After M. JACKSON acknowledged what was said, Bishop also said that "he" (possibly a drug connection of Bishop's) said "it" (cocaine) was "A-1" (good quality). Bishop said that he just spoke to "him" (drug connection/supplier), which was why he was calling M. JACKSON. Bishop then told M. JACKSON, "He told him a different number (dollar amount) last night, but he said if you all come together, he would do it for you all." After M. JACKSON again acknowledged what was said, Bishop told M. JACKSON that whenever he was ready, M. JACKSON should hit "him" (drug connection /supplier) up.[27]

**(2)    May 21, 2007 Calls Regarding Drug Distribution Involving M. JACKSON and Co-Conspirator A**

82.    On May 21, 2007, at approximately 12:21 p.m., Call 858 (**Target Phone 1**), Co-Conspirator C called **Target Phone 1** from phone number (630) 401-4288. When M. JACKSON answered the phone, Co-Conspirator C said, "I need you." M. JACKSON then asked, "What you need one or two (reference to 1/8 th of an ounce of crack cocaine also

---

[27] During this conversation, it appears that "Bishop" was trying to make arrangements for M. JACKSON to purchase quantities of cocaine from someone with whom "Bishop" is in contact. Because "Bishop" made reference for M. JACKSON to call when he was "ready," I believe that this individual is going to supply M. JACKSON with drugs, so M. JACKSON was supposed to call him when M. JACKSON had the money.

38

known as an "8-ball")?" Co-Conspirator C responded, "Two." M. JACKSON explained, "Meet me at the Citgo gas station, and I'll have my bm (code for baby momma referring to Co-Conspirator A) come to that Citgo gas station." Co-Conspirator C confirmed, "At Citgo?" M. JACKSON responded in the affirmative and said, "Call me when you pulling up."

83.     On May 21, 2007, at approximately 12:27 p.m., Call 862 (**Target Phone 1**), Co-Conspirator C called **Target Phone 1** from telephone number (630) 401-4288. After M. JACKSON answered the phone, Co-Conspirator C said, "Tell her to come on.......I'm in Boo Boo's van." M. JACKSON replied, "You know what kind of car she got, she gonna pull up in her little gold car."

84.     On May 21, 2007, at approximately 12:29 p.m., Call 864 (**Target Phone 1**), M. JACKSON, using **Target Phone 1**, called Co-Conspirator C at (630) 401-4288. When Co-Conspirator C answered the phone, M. JACKSON told her, "Yeah, she (Co-Conspirator A) on her way up there right now." Co-Conspirator C then responded, "alright."[28]

      (3)    **May 25, 2007 Calls Regarding Supply involving M. JACKSON and Co-Conspirator B**

85.     On May 25, 2007, at approximately 9:38 a.m., Call 1180 (**Target Phone 1**),

---

[28]The identification of Co-Conspirator A is based on the following: On both June 8, 2007 and June 28, 2007 surveillance was able to view and photograph narcotics transactions based on intercepted telephone calls involving Co-Conspirator A. Surveillance team members were later able to view an Aurora booking photograph of Co-Conspirator A and positively identified her as the individual involved in the narcotics transactions. Second, M. JACKSON refers his narcotics customers to his "BM," or "Baby Momma". According to APD records, Co-Conspirator A is the mother of one of M. JACKSON's children.

M. JACKSON, using **Target Phone 1**, contacted Co-Conspirator B[29] at telephone number (630) 201-8605 (hereinafter Co-Conspirator B Phone B). When Co-Conspirator B answered the phone, M. JACKSON said, "Just grab ten (10) of them (pre-packaged bags of crack cocaine). Alright, and put them in a separate bag."

86.    On May 25, 2007, at approximately 9:39 a.m., Call 1182 (**Target Phone 1**), M. JACKSON, using **Target Phone 1**, called Co-Conspirator B Phone B.   When Co-Conspirator B answered the phone, M. JACKSON said, " Make sure you hold the ten (bags of crack cocaine), and give him, I mean you give Tyeisha the other shit (crack cocaine)." After Co-Conspirator B asked, "What you mean?" M. JACKSON said, "You grab ten of them (bags of crack cocaine) out of there.  You give Tyeisha what you got on you right now and then you hold the other ones."  Co-Conspirator B said, "Ok."  M. JACKSON then said, "They behind the telephone book in the room in that table where the phone is at.  It's (bags of crack cocaine) is behind there."

### (4)    May 25, 2007 Calls Regarding Prices

87.    On May 25, 2007, at approximately 3:51 p.m, Call 1218 (**Target Phone 1**), M. JACKSON called Co-Conspirator D, (630) 664-2950  from **Target Phone 1**.  During the

---

[29]The identification of Co-Conspirator B in this Affidavit is based upon the following:  On June 28, 2007, at approximately 8:56 p.m., Co-Conspirator B, using **Target Phone 1**, placed an outgoing telephone call to an unknown female (Call 4920).  During the call, Co-Conspirator B referred to the unknown female as "Mommy," and the unknown female identified Co-Conspirator B by a nick-name.  Co-Conspirator B also told the unknown female that "Martel bust my eye out." On this same date, the Aurora Police Department responded and investigated a domestic disturbance. According to the police report, Co-Conspirator B, date of birth October 29, 1986, was the complainant against her boyfriend, MARTEL O. JACKSON, date of birth August 16, 1980.

phone conversation, M. JACKSON told Co-Conspirator D that Co-Conspirator E, will probably call him in a minute. Co-Conspirator D then told M. JACKSON that Co-Conspirator E was already asking for a "basket" (1/8 ounce of crack cocaine). M. JACKSON then told Co-Conspirator D that he would not give Co-Conspirator E one until he gave M. JACKSON a hundred ($100).

### (5)    May 27, 2007 Call Regarding Distribution and Supply of Crack Cocaine

88.    On May 27, 2007, at approximately 2:02 p.m, Call 1455 (**Target Phone 1**), Co-Conspirator D called **Target Phone 1** from telephone number (630) 664-2950. When M. JACKSON answered the phone, he told Co-Conspirator D, "I was just finna call your ass and let you know I got 7 left" (meaning he had 7 bags of crack cocaine). Co-Conspirator D then asked M. JACKSON to meet him at Don's house on "Calyo" (Calhoun Street) in Aurora, Illinois.

89.    On May 27, 2007, at approximately 2:05 p.m, Call 1460 (**Target Phone 1**), M. JACKSON called Co-Conspirator D and said, "You better make it over here." When Co-Conspirator D said he was on Calhoun Street, and he did not see M. JACKSON, M. JACKSON told Co-Conspirator D that he was at "Grape Juice's" house and said, "You better hurry up, he (Grape Juice) about to cancel you out (meaning "Grape Juice" was going to obtain the bags of crack cocaine instead of Co-Conspirator D)." Co-Conspirator D then cursed at M. JACKSON and said, "If you sell anything" when the call disconnected.

90.    On May 27, 2007, at approximately 2:12 p.m, Call 1465, M. JACKSON

called Co-Conspirator D on cellular phone (630) 664-2950. When Co-Conspirator D answered the phone, M. JACKSON said, "I want my $10, cause you ain't never give it to me when you got change from CB." After Co-Conspirator D said, "I gave you 170 (meaning $170) nigga." M. JACKSON said, "No you didn't you gave me 160 (meaning Co-Conspirator D gave M. JACKSON only $160). I just counted it."

### (6)    May 29, 2007 Calls Regarding Distribution of Crack Cocaine

91.    On May 29, 2007, at approximately 8:54 p.m., Call 1736 (**Target Phone 1**), Co-Conspirator C called **Target Phone 1** from telephone number (630) 401-4288. When M. JACKSON answered the phone, Co-Conspirator C asked if he was "good" (meaning had a supply of crack cocaine). After M. JACKSON told Co-Conspirator C that he was charging a "buck" ($100 for a quantity of crack cocaine), Co-Conspirator C told M. JACKSON, "As long as it is right (meaning good quality), I don't give a fuck. If it's mushy (meaning if the crack cocaine is not hard but wet or soft), kiss my tushy." After M. JACKSON responded back and said, "Nope its not that. It's not mushy." M. JACKSON and Co-Conspirator C agreed to meet at the liquor store on New York Street.

92.    On May 29, 2007 at approximately 9:02 p.m. Call 1738 (**Target Phone 1**), Co-Conspirator C again called **Target Phone 1**. When M. JACKSON answered the phone, Co-Conspirator C said, "Hey, I got two other people with me who wanna grab something" (meaning Co-Conspirator C had two customers who wanted to purchase crack cocaine). After M. JACKSON said alright, Co-Conspirator C said, "I want mine for eighty" (meaning she wanted to purchase her crack cocaine for $80 instead of the $100 M. JACKSON had told

her earlier).

**(7)     June 4, 2007 Calls with Co-Conspirator B and M. JACKSON
          Regarding Drug Distribution**

93.     On June 4, 2007, at approximately 7:22 p.m., Call 2382 ( **Target Phone 1**),

M. JACKSON, using **Target Phone 1**, called  Co-Conspirator B at telephone number (630)

406-8287, subscriber information unknown (hereinafter Co-Conspirator B Phone A).  When

Co-Conspirator B answered the phone,  M. JACKSON asked, "You wanna ride to the city,

go holla at Bishop ( narcotics supplier in the city of Chicago)?" Co-Conspirator B answered,

"Ok."  M. JACKSON asked, "Where you want to meet me at?"  Co-Conspirator B

responded, "Where you want to meet me at?"  M. JACKSON replied, "I'm at my crib"

(residence).  Co-Conspirator asked, "So you want me to come out there?"  M. JACKSON

answered, "Yeah."

94.     On June 4, 2007, at approximately 7:26 p.m., Call 2386 (**Target Phone 1**), M.

JACKSON, using **Target Phone 1**, called Co-Conspirator B Phone A.  When a small child

answered the phone, M. JACKSON identified himself as "O'Shea."  Co-Conspirator B got

on the phone and M. JACKSON stated, "bring the yams." (code for crack cocaine)  Co-

Conspirator B replied, "alright."

**(8)     June 4, 2007 Calls Concerning Drug Distribution Involving M.
          JACKSON and MOSBY**

95.     On  June 4, 2007, at approximately 6:45 p.m., Call 193 (**Target Phone 2**),

43

MOSBY[30] called **Target Phone 2** from Mosby Phone A. When M. JACKSON answered the phone, he asked, "What you got?" MOSBY replied, "My girl getting ready to come over here..my girl Robin...she wants to spend 100... ( buy $100 worth of crack cocaine). You know how to do it. Make two separate 50's (packaging two $50 bags of crack cocaine) for me." M. JACKSON answered, "Alright man look I'll tell you what, I got to go to my crib and grab it real quick, so you going to have to give me a second...give me a second to get there and bring it back out." When MOSBY asked, "So you got to go all the way out there?" M. JACKSON said, "Yep, I only got a dub ($20 amount of crack cocaine) on me, and I'm shootin' out there right now." MOSBY then stated, "We might meet you out there at the Marathon (gas station) then." M. JACKSON agreed.

96.    On June 4, 2007, at approximately 7:43 p.m., Call 199 (**Target Phone 2**), MOSBY called **Target Phone 2** from Mosby Phone A. When M. JACKSON answered the phone, MOSBY stated, "She (drug customer) didn't even want to come that far but I'm at the room I got mines.....yup my half" ($50). M. JACKSON replied, "Alright well, give me a second, I'm putting this shit (crack cocaine) together now." When MOSBY asked, "Same flavor (reference to the quality of the crack cocaine)?" M. JACKSON replied, "yeah man."

---

[30]The identification of MOSBY in this Affidavit is based upon the following: First, law enforcement had identified CHRISTOPPHER MOSBY on a traffic stop on July 3, 2007. Second, law enforcement has been able to identify MOSBY's voice because that voice was intercepted on several phone calls between MOSBY and M. JACKSON while monitoring **Target Phone 1** and **Target Phone 2**; because MOSBY has identified himself in many of those calls with the same alias name ("BO"), and because his voice was consistently associated with the same phone numbers. Third, during particular intercepted phone conversations, MOSBY arranged to personally meet with M. JACKSON, and these meetings were subsequently monitored by surveillance units. Surveillance units were then able to identify MOSBY after viewing an Illinois Driver's License photograph.

97.     On June 4, 2007, at approximately 8:25 p.m., Call 231 (**Target Phone 2**),

MOSBY called **Target Phone 2** from Mosby Phone A. When M. JACKSON answered the

phone, he told MOSBY, "Here I come man." MOSBY then replied, "Alright."

98.     On June 4, 2007, at approximately 8:29 p.m., surveillance observed M.

JACKSON arrive at the Hanson's Hotel, 1027 East Benton Street, Aurora, Illinois. At this

time, M. JACKSON was driving his black Lincoln Continental. M. JACKSON then parked

his vehicle and went inside an unknown unit.

### (9)     June 8, 2007 Calls Regarding Drug Distribution M. JACKSON and Co-Conspirator A

99.     On June 8, 2007, at approximately 8:42 p.m., Call 1187 (**Target Phone 2**), a

male caller, who identified himself by the first name of "Mike" called **Target Phone 2**, from

phone number (630) 709-0700. When M. JACKSON answered the phone, Mike asked,

"What's up.....what it look like?" M. JACKSON explained, "Shit, gas tank on E......I got like

a little...two fold out" (meaning drug supply was low, but had a little left). Mike asked,

"Yeah well let me get it (amount of crack cocaine)?" M. JACKSON replied, "If you want

it you can have it?" Mike then stated, "Hey look, hold it for me, I'm coming back from

Maywood right now, I need it though." M. JACKSON then said, "Well you can get if for

the low low (price of narcotics)......it's over there at Chel's (Co-Conspirator A's) house. Just

call me and let me know whenever you get back....I'll just tell her to give it to you." Mike

replied, "I appreciate that." M. JACKSON then asked, "Give me a little 70 or somethin' for

it." Mike then said, "I sure appreciate it." M. JACKSON, "I probably pop it off wanna of

45

my licks for 140 (meaning sell to one of M. JACKSON's drug customers for $140)." Mike

responded, "Oh yeah." M. JACKSON confirmed, "He (the lick, meaning the drug customer)

act like he don't got it, but if he call back and he say he got it I'll let you know. If I don't call

you back then it's yours."

100.    On June 8, 2007,  at approximately 9:10 p.m., Call 1191 (**Target Phone 2**),

a male caller, who identified himself as "Andy" called **Target Phone 2** from phone number

(630) 229-0045. When M. JACKSON answered and stated, "I got one big chunk left and I

want a buck forty for it ( $140 for a specific amount of crack cocaine)." Andy asked, "Hold

on for one second....I'll find out right now."

101.    On June 8, 2007, at approximately  9:13 p.m., Call 1201 (**Target Phone 2**),

Andy called  **Target Phone 2** from phone number (630) 229-0045.  When M. JACKSON

answered the phone, Andy asked, "Hey, you take a buck thirty for it ($130 for the crack

cocaine)?"  M. JACKSON replied, "You got it."  Andy then said, "Yeah I got it."  M.

JACKSON told Andy, "Go to the Citgo."

102.    On June 8, 2007,  at approximately 9:14 p.m., Call 1203 (**Target Phone 2**),

Mike called **Target Phone 2** from phone number (630) 709-0700.  When M. JACKSON

answered the phone he  explained, "Yeah, they came with it, they came with a buck thirty

(Andy  willing  to  pay  $130  for  some  crack  cocaine)....I  need  that  (M.  JACKSON

laughing).....I'll be back good though tomorrow, first thing in the morning."  Mike  then

responded, "Alright, I'mma  hit you up."

103.    On June 8, 2007, at approximately 9:22 p.m., Call 1211 (**Target Phone 2**),

Andy called **Target Phone 2** from phone number (630) 777-7081. When M. JACKSON

answered the phone, Andy advised, "I'll be pulling up right now." M. JACKSON stated,

"Alright, I'm finna send somebody up there. What you in?" Andy replied, "I'm in a white

grand am."

104.    On June 8, 2007, at approximately 9:22 p.m., surveillance observed a white

Pontiac Grand Am pull into the parking lot at the Citgo Gas Station located at the intersection

of East New York Street and Trask Avenue in Aurora, Illinois. Once in the parking lot, the

white Grand Am parked on the northeast corner of the Citgo gas station lot next to the pay

phone. At approximately 9:24 p.m., the gold Pontiac Grand Am drove into the Citgo gas

station lot and parked next to the white Grand Am. A white male (believed to be ANDY)

then got out of the white Grand Am and entered the front passenger seat of the gold Grand

Am. At approximately 9:26 p.m., the driver of the white Grand Am, described as a white

male in his mid 20's with brown hair, then left the area. The gold Grand Am then drove

northbound on Trask Street from the Citgo Gas Station. At approximately 9:27 p.m., the

same gold Grand Am, license number 7624467, returned to the gas station lot and parked in

front of the store while surveillance was maintained at the Citgo Gas station. A black female

in her mid 20's wearing a white T-shirt, got out of the gold Grand Am and walked inside the

Citgo gas station. The same black female, later identified by surveillance as Co-Conspirator

A after viewing an Aurora Police Department photograph, then returned to the gold Grand

Am and left the area northbound on Trask. The same vehicle was later observed parked

across the street from 156 Trask Street.

### (10)   June 12, 2007 Calls Regarding Drug Distribution M. JACKSON and Co-Conspirator B

105.   On June 12, 2007, at approximately 10:10 a.m., Call 2272 (**Target Phone 2**), Co-Conspirator B called **Target Phone 2** from Co-Conspirator B Phone B. When M. JACKSON answered the phone, Co-Conspirator B informed M. JACKSON that she was at the "Laundry mat on Indian Trail," and asked M. JACKSON, "I'm just calling to see if you straight?" (did M. JACKSON need any more crack cocaine?)  M. JACKSON answered, "Waiting on Tyrone again" (reference to a narcotics supplier).

106.   On June 12, 2007,  at approximately  11:29 a.m.,  Call 2275 (**Target Phone 2**), a female caller, Co-Conspirator C called **Target Phone 2**, from phone number (630) 401-4288. When M. JACKSON answered the phone, Co-Conspirator C asked, "You still good?" M. JACKSON answered, "Yep, I got like three (3) baskets left (three 1/8 of an ounce quantities of crack cocaine)."  Co-Conspirator C then said, "I need one." M. JACKSON replied, "Shit, I ain't got them on me (reference to the crack cocaine) though, they in the hood...where you at?" Co-Conspirator C replied, "I'm leaving the six." M. JACKSON then told Co-Conspirator C, "Go down Indian Trail,  go to the laundry mat right there, Keisha (Co-Conspirator B) over there." Co-Conspirator C then asked, "Indian Trail and Lake, or Indian Trail by the driver's license place?" M. JACKSON stated, "Hold on, let me ask her (Co-Conspirator B), I think she got that shit (crack cocaine) on her."

107.   On June 12, 2007, at approximately 11:30 a.m., Call 3043 (**Target Phone 1**) M. JACKSON, using **Target Phone 1**, called Co-Conspirator B Phone B.   When Co-

48

Conspirator B answered the phone, M. JACKSON asked, "Why you didn't bring it out..cause you know I was gonna need it (bringing out a supply of crack cocaine)." Co-Conspirator B responded, "Yeah but I didn't want to be...riding around with it (crack cocaine) on me...that's why I had called you this morning to ask you did you want me to bring it (crack cocaine) to you?" M. JACKSON answered, "You already know that, why would I want it (crack cocaine) to stay out there?.......[Co-Conspirator B's knick-name] baby." After Co-Conspirator B responded back by telling M. JACKSON, "I left everything out there." M. JACKSON told Co-Conspirator B to hold while he tells an unknown individual on another phone line, "There's only two left." When M. JACKSON gets back on the phone with Co-Conspirator B, he asked her, "Two of them basket (quantity of crack cocaine) .....there's only three left right?" Co-Conspirator B replied, "I think so, two or three." M. JACKSON asked, "How many you gave to Buddah (another drug customer) then?" Co-Conspirator B said, "Two (reference to a quantity of crack cocaine)."

108.    On June 12, 2007, at approximately 12:18 p.m., Call 2287 (**Target Phone 2**), Co-Conspirator B called **Target Phone 2** from Co-Conspirator B Phone A. When M. JACKSON answered the phone, Co-Conspirator B asked, "Did you still need it (reference quantity of crack cocaine)?" M. JACKSON replied, "Yeah, baby I do." Co-Conspirator B stated, "I'm at the house."

109.    On June 12, 2007, at approximately 12:21 p.m., Call 2291 (**Target Phone 2**), Co-Conspirator C called **Target Phone 2** from phone number (630) 401-4288. When M. JACKSON answered the phone, Co-Conspirator C stated, "I still need you." M. JACKSON

replied, "I'm waiting on this God Damn girl (Co-Conspirator B), she on some bull shit.....she got to go grab that shit (crack cocaine)." Co-Conspirator C responded, "Alright, I'm at the house."

110.    On June 12, 2007, at approximately 12:42 p.m., Call 2295 (**Target Phone 2**), Co-Conspirator B called **Target Phone 2** from Co-Conspirator B Phone B.  When M. JACKSON answered the phone,  Co-Conspirator B asked, "Where you at?" M. JACKSON replied, "Coming from down here where my car was at." Co-Conspirator B stated, "Ok, well I'm here." M. JACKSON answered, "Alright, I'm on my way over there."

### (11)    June 16, 2007 Calls with M. JACKSON and MOSBY Regarding Quality of Crack Cocaine

111.    On June 16, 2007, at approximately 9:56 a.m., Call 3501 (**Target Phone 1**), MOSBY called **Target Phone 1** from Mosby Phone A.  When M. JACKSON answered the phone, MOSBY asked, "You still out there....you still on the east side?" After M. JACKSON replied, "No where you at?"  MOSBY answered, "Down here at Maple Terrace."  M. JACKSON asked, "You got a car right...Gwen down there with you right?" CHRISTOPHER MOSBY answered, "No she gone home." After M. JACKSON asked, "Meet me?" and after MOSBY asked M. JACKSON, "Where?"  M. JACKSON said, "Farnsworth.....what you got?" MOSBY then  replied, "Just a dollar ($100)." When M. JACKSON stated, "Alright, I'm coming to you here."  MOSBY said, "My man, that's what I'm talking about."

112.    On June 16, 2007, at approximately 10:35 a.m., Call 3507 (**Target Phone 1**), MOSBY called **Target Phone 1** from Mosby Phone A. When M. JACKSON answered the

phone, he stated, "I'm coming down Farnsworth right now bro...I got you my nigga....I got something fat for you (crack cocaine)." MOSBY then replied, "Alright. Bet it up."

113.    On June 16, 2007, at approximately 10:50 a.m., Call 3513 (**Target Phone 1**), MOSBY called **Target Phone 1** from Mosby Phone A. When M. JACKSON answered the phone, MOSBY requested, "Tie mine up and burn it (quality of crack cocaine)." M. JACKSON agreed.

114.    On June 16, 2007, at approximately 11:27 p.m., Call 3688 (**Target Phone 1**), MOSBY called **Target Phone 1** from Mosby Phone A. When M. JACKSON answered the phone, MOSBY stated, "Hey I want a refund." After M. JACKSON said, "Oh, okay, give me the yams back(crack cocaine)." MOSBY explained, "I got em' right here in the water for you." When M. JACKSON asked, "What's wrong with them (crack cocaine)?" MOSBY explained, "It's soda...on the real...turns white...I just recooked it.....and when I put it in there all that came back, you know what I'm sayin'." When M. JACKSON asked, "Why you recooked it?" MOSBY replied, "Get that salty shit off of there." M. JACKSON then said, "Man you shouldn't have messed with it, that shit (crack cocaine) probably straight. I ain't got no complaints off that yet." M. JACKSON continued and said, "A lot of mother fuckers ain't going to keep shit real because they going to want to ask for something....when I put it in the water it came right back." After M. JACKSON told MOSBY, "'I ain't got no God Damn refunds." MOSBY answered, "I don't want no refunds.....it looks better."

**(12)    June 19, 2007 Calls concerning Drug Distribution involving M. JACKSON, Co-Conspirator B, and MOSBY**

115.    On June 19, 2007, at approximately 5:33 p.m., Call 3932 (**Target Phone 2**), M. JACKSON, using **Target Phone 2**, called Mosby Phone A.  When MOSBY answered the phone, M. JACKSON stated, "Yes I'm calling from King Cheetah's office, he will be in his office at 7 o' clock tonight."  MOSBY responded, "Oh King Cheetah...... let him know Prince Bo wants to see him...as soon as possible."  When M. JACKSON repeated, "I will be in my office at 7 o' clock, maybe earlier ( ready to sell crack cocaine at 7:00 p.m.)."  MOSBY stated, "Okay, well make sure you tell him to give me a call and let me know because it's been really fucked up without him."  MOSBY then told M. JACKSON, "Man she scared me when she told me you were finna get a job..talking about a job...I've never heard him (M. JACKSON) say that" After M. JACKSON stated, "Man I'm at work."  MOSBY asked, "Man what you doing, in the kitchen" (reference to cooking powder cocaine into crack cocaine)?  When M. JACKSON answered, "Yep."  MOSBY said, "Well come on through, I'm down at the building."  After M. JACKSON said, "Alright."  MOSBY asked, "You can't stop and come up cuz?"  M. JACKSON replied, "You know I ain't got no time for that right there cause everybody (drug customers) already calling, I just turned my phones back on."  MOSBY acknowledged, "Oh, ok."  M. JACKSON continued and explained, "I'm just calling everybody, whoever don't call whoever call me I'm catching them to."  MOSBY responded, "right, right."

116.    On  June 19, 2007, at approximately 6:07 p.m., Call 3962 (**Target Phone 1**),

M. JACKSON, using **Target Phone 1**, called Co-Conspirator B at Co-Conspirator B Phone

B. When Co-Conspirator B answered the phone, M. JACKSON asked, "Could you be here

ah at 6:45." Co-Conspirator B asked, "By 6:45?" M. JACKSON replied, "6:45, 6:45, 6:50

the latest." Co-Conspirator B answered, "Ok." M. JACKSON explained, "Yep, and I'm

already done bagging my yams up ( pre-packaging individual quantities of crack cocaine)."

Co-Conspirator B replied, "alright."

117. On June 19, 2007, at approximately 6:09 p.m., Call 3963 (**Target Phone 1**),

Co-Conspirator B called  **Target Phone 1** from Co-Conspirator B Phone B.  When M.

JACKSON answered the phone,  Co-Conspirator B asked, "Can you make it like 7:00?" M.

JACKSON asked, "Why?" M. JACKSON then tells BLACK, "Shit 7:00 on the dot cause

I already told motherfuckers (drug customers) I'm going to be outside (he will be out selling

drugs) at 7:00 on the dot." Co-Conspirator B replied, "I'm not finna be long."

118. On June 19, 2007,  at approximately 7:54 p.m., Call 3974 (**Target Phone 1**),

M. JACKSON using **Target Phone 1**,  called Mosby Phone A.  When MOSBY answered

the phone, M. JACKSON told  him, "Meet me at the laundry mat." MOSBY responded,

"Alright."

119. On June 19, 2007,  at approximately 8:01 p.m., Call 3975 (**Target Phone 1**),

MOSBY called **Target Phone 1** from Mosby Phone A and told M. JACKSON,  "Make it a

dollar ($100 worth of crack cocaine)." MOSBY also told M. JACKSON, "I'm at the laundry

mat already." M. JACKSON replied, "Alright, I'll be right there."

120. On June 19, 2007, at approximately 8:05 p.m.,  surveillance observed  M.

JACKSON and MOSBY meeting at a laundromat parking lot located on the southwest corner

of Smith Street and Galena Boulevard in Aurora, Illinois. At that time, surveillance observed

MOSBY entering the rear passenger seats of M. JACKSON's black Lincoln Continental.

At the time, M. JACKSON was sitting in the front passenger seat of the vehicle, and a black

female, believed to be Co-Conspirator B was the driver.[31]

### (13)    June 22, 2007 Call concerning Drug Distribution between M. JACKSON and MOSBY

121.    On June 22, 2007, at approximately 6:04 p.m., Call 4286 (**Target Phone 1**),

MOSBY called **Target Phone 1** from Mosby Phone A. When M. JACKSON answered the

phone, MOSBY told M. JACKSON, "Make it 60 ($60 worth of crack cocaine) man."

After M. JACKSON confirmed and told MOSBY, "Yep, I'm on my way." MOSBY asked,

"How far away is you?" M. JACKSON then answered, "On fucking New York......got traffic

so what" MOSBY then explained, "Shit cause you got people (drug customers) waiting

still." After M. JACKSON said, "I had to pick my wife up and take her home.....that's what

good about working for yourself." MOSBY replied, "Yep, that's true." M. JACKSON then

said, "I'll be right there."[32]

---

[31]Because he has a revoked driver's license, M. JACKSON would frequently have Co-Conspirator B, who has a valid drivers license, drive for him.

[32] During this particular phone conversation, I believe that MOSBY had gathered several customers for M. JACKSON that wanted to purchase quantities of crack cocaine from him and was now telling M. JACKSON that these customers were all waiting for him to arrive.

### (14)    June 23, 2007 Calls Regarding  Drug Distribution M. JACKSON and C. JACKSON

122.    On  June 23, 2007, at approximately 4:22 p.m., Call 4766 (**Target Phone 2**), an unknown male, who identified himself as "CHRIS" called  **Target Phone 2**  from phone number (630) 898-7593.  When  M. JACKSON answered the phone,  CHRIS (Last Name Unknown) asked if he could "swing by for a forty" (meaning $40 worth of crack cocaine)? M. JACKSON replied in the affirmative and was heard in the background talking to C. JACKSON,[33] "Put that shit in your coochie.  Is it in your coochie?  This shit in your cooch. In your coochie.  In your coochie" (reference to concealing narcotics in genital area).[34]

123.    On June 23, 2007, at approximately 4:25 p.m., Call 4772 (**Target Phone 2**), and while still sitting in his vehicle after being pulled over by officers from the Kane County Sheriff's Department, M. JACKSON, using **Target Phone 2,**  called  Co-Conspirator F at phone number (630) 723-4171.  When Co-Conspirator F answered the phone, M. JACKSON warned Co-Conspirator F, "They (police) said they gonna be over there all night.  You all

---

[33]The identification of C. JACKSON is based on the following: First, law enforcement has been able to identify C. JACKSON's voice because that voice has been intercepted numerous times on **Target Phone 1 and 2** and because C. JACKSON was identified in many of those calls, and because the voice was consistently associated with the same phone number(s). Second, surveillance observed C. JACKSON with M. JACKSON driving the black Lincoln Continental when this particular vehicle was pulled over by law enforcement.  During two separate traffic stops, the black female riding with M. JACKSON provided identification to law enforcement that identified her as C. JACKSON.

[34] At the time Call 4766 (**Target Phone 2**), M. JACKSON's black Lincoln Continental was being pulled over by the Kane County Sheriff's Department.  Because M. JACKSON had quantities of crack cocaine on his person, he was telling his wife, C. JACKSON, to hide the crack cocaine, so it would not be detected by the police if he or his wife were searched.

better quit what you all do'in" (selling drugs at or near this traffic stop location). While talking on the phone with Co-Conspirator F, M. JACKSON was heard in the background answering the officers questions before getting back on the phone line and telling Co-Conspirator F, "I don't know what you all got going on man, you all better quit, they said they gonna be sittin' there all day." M. JACKSON was later heard again in the background talking to C. JACKSON stating, "Put that in your pussy (reference to concealing narcotics in genital area)."[35]

### (15)    June 23, 2007 Calling concerning Drug Distribution between M. JACKSON and MOSBY

124.    On June 23, 2007, at approximately 5:04 p.m., Call 4807 (**Target Phone 2**), M. JACKSON, using **Target Phone 2**, called Mosby Phone A. When MOSBY answered the phone, M. JACKSON explained, "I got stressed out by mother fucking police." After MOSBY asked, "Where at?" M. JACKSON replied, "On Liberty man......thirsty ass Kane County Detectives." MOSBY then asked, "What he stop you for?" M. JACKSON said, "Talking about somebody seen me from a hot spot" (drug stash house). After MOSBY said, "Oh, you must of been over by at dudes." M. JACKSON said, "Um, um, that' where I was at." MOSBY then explained, "Them nigga's oughta told you man." When M. JACKSON agreed and said, "Yep, [Co-Conspirator F's first name], told me." MOSBY said, "Oh, he had told you, but you were like fuck it!" M. JACKSON then explained, "I just went over there

---

[35] After the traffic stop was completed, surveillance agents spoke with one of the Kane County Sheriff's Deputies, who had conducted the traffic stop. The Deputy confirmed that he had identified the driver of the black Lincoln Continental as C. JACKSON and the front seat passenger in the vehicle as M. JACKSON.

right now, [Co-Conspirator F's first name] just snapped on....I was going over to see " (Co-Conspirator G).  MOSBY replied, "Umm, umm that spot is hot as hell...the police come up in there anytime they want to....that spot there on fire" (there is a large police presence on that particular residence)."  MOSBY and M. JACKSON then  agreed  to meet at the "room".[36]

### (16)    June 25, 2007 Call Concerning Drug Distribution Involving M. JACKSON and MOSBY

125.    On June 25, 2007, at approximately 11:03 a.m., Call 4597 (**Target Phone 1**), MOSBY called **Target Phone 1** from Mosby Phone A.  When M. JACKSON answered the phone,  MOSBY told M. JACKSON, "I need to see you, got a 40 ($40 for crack cocaine)." M. JACKSON replied, "Alright cool..I want you to try some out to and tell me what it like anyway (testing  the quality of the crack cocaine)....I'm finna go pick KB up real quick and then I'll be over there."

### (17)    June 26, 2007 Call Concerning Drug Distribution / Fronting M. JACKSON and MOSBY

126.    On June 26, 2007, at approximately 5:00 p.m., Call 4724 (**Target Phone 1**), MOSBY called **Target Phone 1** from Mosby Phone A.  During their conversation, MOSBY informed M. JACKSON, "Hey, I made that forty man (selling $40 worth of crack cocaine)." After M. JACKSON said, "Alright."  MOSBY asked, "Can you front me some more

---

[36] Based on prior surveillance and intercepted phone conversations, the "room" where MOSBY wanted M. JACKSON to meet is actually the Hanson Hotel, 1027 East Benton Street, Aurora, Illinois where MOSBY sells crack cocaine from one of the hotel rooms.

(reference to giving MOSBY crack cocaine on credit)?" When M. JACKSON replied, "I'll

be over there." MOSBY stated, "Alright, give me a call, right now I'm at the building." [37]

### (18)    June 27, 2007 Calls Regarding Drug Payment M. JACKSON and C. JACKSON

127.    On June 27, 2007, at approximately 4:38 p.m., Call 5649 (**Target Phone 2**),

a unknown female, who identified herself as "Star" called **Target Phone 2** from phone

number (630) 770-2938. When M. JACKSON answered the phone, the female identified

herself as Star and said, "What's up pham? This is Star, I got something for you from dude

( Co-Conspirator F)....where you want me to holler at you at?" M. JACKSON asked, "Does

he (Co-Conspirator F) want something else too (wanting more crack cocaine)?" Star replied,

"Not right now, I don't think so." M. JACKSON explained, "I'm finna have my girl meet you

real quick and get it (pick up the money for previously fronted crack cocaine)." M.

JACKSON then placed Star on hold and talked to someone in the background on another

phone line saying, "Where you at?......go to the Burger King real quick somebody going to

give you one hundred dollars for me alright." M. JACKSON then got back on the line with

Star and asked, "You know what kind of car she in....she in the Lincoln (reference to M.

JACKSON's Lincoln Continental)." M. JACKSON was again heard in the background

talking on another phone line and saying, "A girl named Star is gonna give you one

hundred." M. JACKSON then returned to the conversation with Star and stated, "Alright,

---

[37] Based on surveillance and prior intercepted phone calls, the building MOSBY is referring to is the Maple Terrace Apartment Complex, 905 Second Avenue and 904 North Avenue, Aurora, Illinois, where MOSBY will frequently stay and where he will also frequently sell crack cocaine.

give it (meaning the $100) to my wife (C. JACKSON) for me Star."[38]

128.    On June 27, 2007, at approximately 4:46 p.m., Call 5653 (**Target Phone 2**),

M. JACKSON, using **Target Phone 2**, placed an outgoing telephone call to Star at phone

number (630) 770-2938.  When an unknown male answered the phone, M. JACKSON

identified himself as "O'Shea" and asked, "Where Star at?"  The male  identified himself as

Co-Conspirator F's younger brother and advised, "She (Star) right here."  M. JACKSON

asked, "Where you all at, my wife (C. JACKSON) waiting on you all."  Co-Conspirator F's

younger brother responded, "We're at the Marathon on New York."  M. JACKSON replied,

"Nah, she (C. JACKSON) said come to the Burger King."  Co-Conspirator F's younger

brother acknowledged and stated, "Alright, we'll be there...I'll be there in five minutes."

### (19)    June 28, 2007 Calls Regarding Drug Distribution M. JACKSON and Co-Conspirator A

129.    On or about June 28,  2007, at approximately 1:54 p.m., Call 5873 (**Target**

**Phone 2**), Co-Conspirator G," called **Target Phone 2** from phone number (630) 723-4171.

When M. JACKSON answered the phone, Co-Conspirator G told him, "Bring me three of

them (1/8 th on an ounce quantities of crack cocaine)."  M. JACKSON responded, "Hey [Co-

Conspirator G], who you with Co-Conspirator G?"  Co-Conspirator G responded, "My guy

Steve."  M. JACKSON asked, "What kind of car you'll in?"  Co-Conspirator G answered,

"That little white car."  M. JACKSON explained, "Hey look, go to my girl's house,  and she

---

[38]On May 15, 2008, I went to the Kane County Clerk's Office in Geneva, Illinois.  At that time, I obtained a certified copy of a Marriage License.  According to the information noted on the license, M. O'SHEA JACKSON and CRYSTAL RENEE WALKER (JACKSON) were legally married on January 24, 2003 in Saint Charles, Illinois.

going to give it to you, right there on Trask and Kane." Co-Conspirator G asked, "Where me and [Co-Conspirator F's first name] went the last time?" M. JACKSON replied, "I think [Co-Conspirator F's first name] did go over there....156 Trask...pull into the driveway..just pull to the side." Co-Conspirator G confirmed, "Pull to the side?" M. JACKSON then stated, "She gonna come outside." Co-Conspirator G, "Alright." M. JACKSON, "I'm gonna tell her what you all gonna give to her." M. JACKSON is then heard in the background talking on another phone line saying, "They gonna give you $300."

130.   On June 28, 2008, at approximately 1:59 p.m., Call 5875 (**Target Phone 2**), Co-Conspirator G called **Target Phone 2** from phone number (630) 723-4171. When M. JACKSON answered the phone, Co-Conspirator G said, "What's good....I'm right here at Trask and Kane." M. JACKSON stated, "Go in front of 156 Trask. The white house on the corner, you might see a little burgundy Alero in the driveway." M. JACKSON was then heard in the background talking on another phone line asking, "Chel (Co-Conspirator A) ain't your sister car in the driveway?" M. JACKSON then told Co-Conspirator G again, "It's a burgundy Alero in the driveway." Co-Conspirator G stated, "I see it...I'm right here out front." M. JACKSON responded, "Pull right up, right there, she gonna come outside."

131.   On June 28, 2007, at approximately 1:55 p.m, surveillance observed a white Mitsubishi Mirage, license number 6226933 arrive and park in front of 156 Trask. A black female, later identified by surveillance as Co-Conspirator A, walked out of the residence (156 Trask) and walked over to the white Mitsubishi. Co-Conspirator A then walked over to the front passenger door, where an exchange was made. At approximately 2:00 p.m., the

white Mitsubishi left the area and a traffic stop was conducted on Grand Boulevard just west of Sumner Street. The driver of the vehicle was then identified as Co-Conspirator G, while the passenger was identified as Co-Conspirator H. During a search of the vehicle and of the occupants, no contraband was found at this time.

132.   On June 28 , 2007, at approximately 2:15 p.m., Call 4861 (**Target Phone 1**), an unknown female, who identified herself using the name of "Star" called **Target Phone 1** from phone number (630) 770-2938. When M. JACKSON answered the phone, he asked, "Where you at?" Star responded, "In the hole, Prairie and Terry, over by Westwood." M. JACKSON said, "Come to the east side." Star asked, "What same place?" M. JACKSON answered, "Yeah....call me when you get on the east side...on New York.

133.   On June 28, 2007, at approximately 2:40 p.m., Call 4871 (**Target Phone 1**), Star called **Target Phone 1** from phone number (630) 770-2938. When M. JACKSON answered, Star identified herself and had an unknown male get on the phone. This unknown male then explained that they were at the Burger King. M. JACKSON stated, "Go to my baby momma's house...my baby momma (Co-Conspirator A) live right down the street nigga, by the Citgo." When the unknown male asked what street, M. JACKSON said, "Trask, 156 Trask. Call me when you outside, pull in the front."

134.   On June 28, 2007, at approximately 2:46 p.m., Call 4873 (**Target Phone 1**), M. JackSON, using **Target Phone 1**, called Star at phone number (630) 770-2938. When Star answered the phone, M. JACKSON asked, "Where you all at?" Star replied, right here on Trask....coming from the Citgo." M. JACKSON then explained, "Go to 156...it's a house

on the corner...it's a burgundy Alero in the driveway." When Star confirmed, "A burgundy Alero.?" Star was heard in the background saying, "right here." M. JACKSON can then be heard talking in the background on another phone line, "You see them Chel (Co-Conspirator A)?" M. JACKSON asked Star, "How many you all want, one or two (1/8th on an ounce of crack cocaine also known as "8-ball" quantities) ?" When Star responded, "one." M. JACKSON was heard again in the background stating, "give them one [nickname for Co-Conspirator A]."

### (20)    June 30, 2007 Calls Regarding Drug Distribution involving M. JACKSON, Co-Conspirator A, and MOSBY

135.    On June 30, 2007, at approximately 7:14 p.m., Call 6685 (**Target Phone 2**), MOSBY, also known as "BO," called **Target Phone 2** from Mosby Phone A. When M. JACKSON answered the phone, MOSBY asked, "I need another one of them (bag of crack cocaine) man." M. JACKSON answered, "Where you at?" MOSBY replied, "I'm over here at the hotel." M. JACKSON explained, "I'mma have Chel (reference to Co-Conspirator A) come over there now."

136.    On June 30, 2007, at approximately 7:18 p.m., Call 6687 (**Target Phone 2**), MOSBY called **Target Phone 2** from Mosby Phone A. When M. JACKSON answered, MOSBY asked, "Did you call her (Co-Conspirator A)?" M. JACKSON answered, "She on her way." MOSBY asked, "That's the one in the gold car right?"[39] M. JACKSON replied,

---

[39] From previous contact and observations, I'm aware that Co-Conspirator A drives a gold Pontiac Grand Am , which is registered in her name.

"She (Co-Conspirator A) going to be in my car." MOSBY replied, "oh, ok."[40]

137.    On June 30, 2007, at approximately 8:53 p.m., Call 6711 (**Target Phone 2**), MOSBY called **Target Phone 2** from Mosby Phone A. When M. JACKSON answered the phone, MOSBY asked, "Where you at?" M. JACKSON replied, "In the city." MOSBY then told M. JACKSON, "I need another one (1/8 th ounce quantity of crack cocaine)." When M. JACKSON asked, "Where you at?" MOSBY said, "Over here at the hotel." M. JACKSON explained, "I'm finna have her bring it over there." MOSBY asked, "What can I get for two of them (1/8 th ounce quantity of crack cocaine)." M. JACKSON answered,"90 ($90 for the crack cocaine)." MOSBY, "Alright cuz." M. JACKSON asked, "That's what you want?" MOSBY replied, "Yeah."

138.    On June 30, 2007, at approximately 11:10 p.m., Call 6755 (**Target Phone 2**), MOSBY called **Target Phone 2** from Mosby Phone A. When M. JACKSON answered, MOSBY asked, "Got that same thing (same amount of crack cocaine from previous drug transactions)?" M. JACKSON replied, "What's that 90 ($90 worth of crack cocaine)?" MOSBY anwered, "Yeah." M. JACKSON asked, "You ain't got no car?" MOSBY replied, "Yeah, I'm with somebody right now." M. JACKSON explained, "Go to the Citgo....call me

---

[40] On June 30, 2007, which is the same date Co-Conspirator A met with MOSBY, Co-Conspirator A was pulled over by the Naperville Police Department at approximately 9:28 p.m. while traveling westbound on Jefferson Street toward Ogden Avenue. At that time, Co-Conspirator A was driving a 1998 Lincoln black in color with temporary license plate number 679H464, which is a vehicle registered to CRYSTAL JACKSON, 120 Testa Drive, Naperville, Illinois and which is also the same vehicle that M. JACKSON frequently used to deliver crack cocaine. During the traffic stop, the driver was identified as Co-Conspirator A, date of birth March 26, 1980. Co-Conspirator A received a traffic citation for Failure to Secure a Child Under 8 in Child Safety Seat.

when you at Citgo."

139.   On June 30, 2007, at approximately 11:12 p.m., Call 6757 (**Target Phone 2**), MOSBY called **Target Phone 2** from Mosby Phone A.  When M. JACKSON answered the phone, MOSBY stated, "Yeah, I'm here." M. JACKSON replied, "Alright...shit." MOSBY asked, "You want me to walk down the street?"[41]  M. JACKSON replied, "Yeah, start walking down that way.  I'mma have her (Co-Conspirator A) start walking up."  When MOSBY said, "Ok, bet." M. JACKSON stated, "Don't go to the house though." MOSBY replied, "No, nah, I know better than that."

140.   On June 30, 2007, at approximately 11:16 p.m., Call 6762 (**Target Phone 2**), M. JACKSON, using **Target Phone 2**, called Mosby Phone A.  When MOSBY answered the phone, M. JACKSON asked, "Yeah, you see her (Co-Conspirator A)?" MOSBY replied, "Yeah, yeah."

### (21)   July 1, 2007 Call Regarding Quality of Crack Cocaine M. JACKSON and MOSBY

141.   On  July 1, 2007, at approximately 8:11 a.m., Call 6912 (**Target Phone 2**), MOSBY called **Target Phone 2**  from Mosby Phone A. When M. JACKSON answered the phone,  MOSBY told M. JACKSON, "You switched up on me (reference to the quality of crack cocaine)." After M. JACKSON replied, "No, not really a little bit though.....something wrong with that?" MOSBY responded, "That shit get UI (unintelligible) soda (mixing agent

---

[41] From previous contact and observations, I'm aware that Co-Conspirator A lives down the street from the Citgo Gas Station at 156 Trask Street Aurora, Illinois.

in the crack cocaine), on the real...I just had to re-cook that shit (crack cocaine)...I ain't gonna lie to you." M. JACKSON stated, "Yeah right....I ain't even put none of that in there." When M. JACKSON later asked, "You trying to say it didn't do nothin'?" MOSBY explained, "Shit caught on fire on the thing.....I re-cooked that shit...it's half of what I have, but it's a lot better." M. JACKSON then explained, "It (reference to the crack cocaine) ain't worser than what I had before." MOSBY replied, "What you had before didn't have no geek to it....kick (potency of the crack cocaine)." MOSBY then asked, "What time you coming out?" After MOSBY complained about M. JACKSON not answering his phone and "Crystal" (reference to C. JACKSON) not coming to the door, M. JACKSON explained, "I ran out of that other stuff (batch of crack cocaine)...everybody (drug customers) like that." MOSBY responded, "Yeah, hell yeah...if I had a quarter (reference to an amount of crack cocaine) of that last night probably made a killing (reselling crack cocaine)." M. JACKSON then said, "That's why I only sold 50's ($50 amounts of crack cocaine) of it....anything lesser than that was uncivilized." When MOSBY said, "Hell yeah, get rid of it, don't make no difference." M. JACKSON responded, "I'mma  get rid of it in a minute, it'll be gone fast...about a day and a half."

### (22)    July 2, 2007 Calls regarding Drug Distribution involving M. JACKSON and Co-Conspirator A

142.    On  July 2, 2007, at approximately 11:20 a.m., Call 7043 (**Target Phone 2**), M. JACKSON, using **Target Phone 2**, called  phone number (630) 768-3822 (hereinafter referred to as Co-Conspirator A Phone A).  When Co-Conspirator A answered the phone,

M. JACKSON asked, "Hey can you do me a favor?  Can you let me know how many...how many of each of those is in there?  How many little ones, how many big ones (amounts and quantities of crack cocaine)?"  Co-Conspirator A responded, "Umm umm."  M. JACKSON replied, "Alright."  Co-Conspirator A replied, "Alright."

143.    On July 2, 2007, at approximately 12:09 p.m., Call 7046 (**Target Phone 2**), an unknown male, who identified himself as Little Derrick, called **Target Phone 2** from phone number (630) 770-3519.  When M. JACKSON answered the phone,  the unknown male stated "This is Little Derrick man.....trying to grab like two of them little things" (specific quantity of crack cocaine possibly 1/8th of an ounce).  M. JACKSON replied, "Shit, go to my BM (Co-Conspirator A's) crib."  Little Derrick answered, "Alright, I'mma call you when I get over there."

144.    On July 2, 2008, at approximately 1:09 p.m., Call 7059 (**Target Phone 2**), Little Derrick called  **Target Phone 2** from phone number (630) 770-3519.  When M. JACKSON answered,  Little Derrick stated, "This is Little Derrick....I just got to the east side."  M. JACKSON asked, "Let me know when you over by her crib...I'll let her (Co-Conspirator A) know you outside."  When Little Derrick  replied, "I'm outside right now."  M. JACKSON answered, "Alright."

### (23)    July 3, 2007 Calls Regarding M. JACKSON and C. JACKSON Distributing Crack Cocaine and Seizure of Crack Cocaine

145.    On July 3, 2007, surveillance units followed M. JACKSON's black Lincoln Continental your Affiant believes, based on the following intercepted and monitored phone

calls and related surveillance, M. JACKSON delivered quantities of cocaine to various individuals:

        a.      On July 3, 2007, at approximately 1:36 p.m. Call 7385 (**Target Phone 2**), M. JACKSON using **Target Phone 2** called phone number (630) 375-9972.  When Co-Conspirator I answered the phone, he told M. JACKSON that he was about to call him.  M. JACKSON then said, You'll held on to that (quantity of crack cocaine) for a long time." Co-Conspirator I  responded back, "We're trying to do something with it....a little here little there...it just didn't happen that right way... gonna be looking for some work (crack cocaine) right now... I got it down the line...you wanna come over?"  When M. JACKSON said he would come over, Co-Conspirator I told M. JACKSON "15, 150" (meaning $150 worth of crack cocaine).

        b.      At approximately 2:35 p.m. on July 3, 2007,  physical surveillance observed M. JACKSON's black Lincoln Continental pull into the driveway located at 400 Bangs Street in Aurora, Illinois. A white male, believed to be Co-Conspirator I, then walked up to the front passenger window of the vehicle. M. JACKSON's vehicle then left the area. At the time, M. JackSON was sitting in the front passenger's seat, and a black female, later identified as C. JACKSON,  was the driver.

        c.      On July 3, 2007, at approximately 2:02 p.m., Call 7396 (**Target Phone 2**), M. JACKSON using **Target Phone 2** called phone number (630) 901-5451.  When the unknown male (hereinafter identified as Co-Conspirator H) answered the phone, he told M. JACKSON that he had been trying to find M. JACKSON's phone number.  Co-Conspirator

H then said, "Tell me something damn good nigga." M. JACKSON responded by telling him, "You know it (crack cocaine) is always good." Co-Conspirator I then told M. JACKSON, "Man, bring me two of them baskets (1/8 th of an ounce of crack cocaine) now." M. JACKSON then told Co-Conspirator H, "Somebody just told him that they needed four (4) of them down there." After Co-Conspirator H again said that he needed "two baskets" M. JACKSON said, "I will be right on my way, I got some quarters bagged up....I'll just give you a quaker (1/4 of an ounce of crack cocaine)." Co-Conspirator H then told M. JACKSON, "Alright holler, don't do me bad." M. JACKSON replied back, "Have I ever, that ain't my style." After Co-Conspirator H said, "No you right......alright come on." M. JACKSON told Co-Conspirator H that he was on his way.

      d.    At approximately 2:24 p.m. on July 3, 2008, physical surveillance observed M. JACKSON's black Lincoln Continental arrive at a business site located near the intersection of Jericho and Terry Avenue in Aurora, Illinois. After driving back into the area of several buildings located approximately 50 yards east from the roadway (Terry Avenue), the black Lincoln Continental was observed leaving the area at approximately 2:28 p.m.. At that time, M. JACKSON was sitting in the front passenger seat and a black female, later identified as C. JACKSON, was the driver.

      146.   On July 3, 2007 at approximately 2:43 p.m., surveillance units requested that the Aurora Police Department conduct a traffic stop on the black Lincoln Continental.[42] A

---

    [42]The black Lincoln Continental with temporary license plate number 679H464, that was stopped and occupied by both M. JACKSON and C. JACKSON, was registered to C. JACKSON, 120 Testa Drive, Apartment 103, Naperville, Illinois 60540 on a 2000 Lincoln.

traffic stop was conducted near the intersection of Second and Hill Avenue.

   a. During the traffic stop, an officer identified C. JACKSON as the driver and M. JackSON as the front seat passenger. When the traffic stop occurred, the officer told C. JACKSON that she was being pulled over for the dark window tint on her vehicle. Subsequent to the stop, both M. JackSON and C. JACKSON were searched , however no narcotics or other contraband were found on their person at this time. While M. JACKSON was secured in handcuffs standing outside of the black Lincoln Continental, a canine officer from the Kane County Sheriff's Department had his dog walk around the exterior of the vehicle. When the dog approached the passenger side rear fender, the dog stopped and scratched near the gas tank flap, which indicated the possible presence of narcotics in this area. When this was opened, officers located a plastic bag containing three individually wrapped bags of a white rock like substance that based on texture and color appeared to be crack cocaine. As soon as the plastic bag with crack cocaine was recovered, M. JACKSON told the officers on the scene that he did not know what they had just found, but he immediately said that the car was not his. After recovering the crack cocaine, M. JackSON was searched and $2,704 in United States Currency was found in M. JACKSON's pants pocket. At the time, M. JACKSON also had three cellular phones attached on his waist.

   b. An Aurora Police Department officer then spoke with C. JACKSON. While speaking to C. JACKSON, she told the officer that whatever they found was hers and not his (M. JackSON's) because it was her car. C. JACKSON was then searched by a female officer from the Aurora Police Department, however no money or contraband was found on

her person at this time.

        c.     Because investigators wanted to monitor M. JACKSON and his activity the rest of the day, the decision was made to seize the drugs and money obtained at this time. Both M. JACKSON and C. JACKSON were then released from the scene without being charged.

        d.     The substance seized from M. JackSON and C. JACKSON was subsequently submitted to the DEA Crime Lab for analysis, which showed that the substance was 8.3 grams of cocaine base. Based upon your Affiant's experience, the white rock like appearance of the substance bought, and the lab results, your Affiant believes the substance bought from M. JACKSON was crack cocaine.

        147.   On July 3, 2007, and after the traffic stop at approximately 4:29 p.m., Call 7465 (**Target Phone 2**), an unknown male called **Target Phone 2** from phone number (630) 375-8306. When M. JackSON answered the phone, the unknown male asked, "Hey, how long you gonna be?" M. JACKSON replied, "Man, I don't even know what I got on me, I don't even got barely anything left...... I was about to go, you know what I'm saying...about to go to the candy store (reference to M. JACKSON re-supplying his quantity of crack cocaine)." The unknown male then asked, "So what, you don't got nothin' for me or what (purchasing some crack cocaine)?" M. JACKSON responded, "Shit, my wife (C. JACKSON) had to cuff that shit. (concealing crack cocaine from law enforcement)." The unknown male confirmed, "Oh, you said she had to cuff it....I'mma call you right back, answer your phone."

### (24) July 3, 2007 Calls Regarding Drug Distribution involving M. JACKSON and MOSBY

148.    On July 3, 2007, the following telephone conversations between MOSBY and M. JackSON were intercepted on **Target Phone 2**.    While monitoring these phone conversations, surveillance units initiated a traffic stop on MOSBY's vehicle.

a.    On July 3, 2007, at approximately 9:03 p.m., Call 7527 (**Target Phone 2**), MOSBY contacted **Target Phone 2** from Mosby Phone A.  M. JACKSON explained, "These mother fuckers (police)  took $2700 from me." When MOSBY asked, "Took it from you....but the wifey (C. JACKSON) work right?"  M. JACKSON answered, "Yep." MOSBY then said,  "Ok, well she got a job, call Fred (a defense attorney)  and get that back.....Fred might want a little somethin' but you get that right back."  M. JACKSON said, "I'll probably be right back out though man, I don't know I got to put something together real quick (packaging and selling more crack cocaine)." When MOSBY said, "Oh ok, cause you know today's the third, and these joker's (drug customers) spending like crazy." M. JACKSON said, "Alright, I'mma put it together real quick."  MOSBY then replied, "Ok, bet."

b.    On July 3, 2007, at approximately 10:42 p.m., Call 7584 (**Target Phone 2**), M. JACKSON, using **Target Phone 2**, called Mosby Phone A.  When MOSBY answered the phone, he asked M. JACKSON, "You still at the house?"  When M. JACKSON replied, "Yeah."  MOSBY said, "I'm finna have Gwen bring me up there."  MOSBY then asked M. JACKSON for a "half." (half an ounce of crack cocaine).  M. JACKSON replied, "Alright."

71

c.       On July 3, 2007, at approximately 11:00 p.m., surveillance observed and identified MOSBY arriving at M. JACKSON's residence located at 120 Testa Drive, Naperville, Illinois in a green Nissan Maxima. MOSBY met with M. JACKSON in the parking lot of the apartment complex before they both went inside the building.

d.       On July 3, 2007, at approximately 11:02 p.m., physical surveillance observed MOSBY leaving M. JACKSON's apartment building and getting in the green Nissan. Vehicle then traveled westbound on Jefferson Street. Once MOSBY's vehicle reached Liberty Street just west of Commons Drive, a traffic stop was conducted. During the traffic stop, MOSBY was identified as the front seat passenger. The female driver was identified as MOSBY's sister.

e.       On July 3, 2007, at approximately 11:32 p.m., Call 7607 (**Target Phone 2**), M. JACKSON, using **Target Phone 2**, called Mosby Phone A. When MOSBY answered the phone, he told M. JACKSON, "Police pulled us over man, just when we left you." MOSBY proceeded to explain the circumstances surrounding the traffic stop to M. JACKSON. When M. JACKSON asked, "You cool?" MOSBY replied, "Yeah so far, I had to stuff that shit (crack cocaine) up my ass." M. JACKSON then asked, "They (police) pat you down already?" MOSBY said, "Yeah.......talking about you ain't got nothing up your ass, I said hell nah."

f.       On July 3, 2007, at approximately 11:47 p.m., Call 7611 (**Target Phone 2**), MOSBY called **Target Phone 2** from Mosby Phone A. M. JACKSON asked, "You said you got that shit (crack cocaine) cuffed up good right?" MOSBY replied, "Yeah, it's in my

ass?" M. JACKSON counseled MOSBY about what the police could and couldn't do during the traffic stop. MOSBY was subsequently released at the scene without any charges.

g.    While at the traffic stop, both MOSBY and his sister were searched, however no contraband of any kind was found on either person.[43] A canine unit from the Kane County Sheriff's Department also responded to the scene in order to search MOSBY's vehicle. Although the drug dog "hit or indicated" on the front passenger seat where CHRISTOPHER MOSBY was sitting, no contraband could be found in this area at this time.

## V.    CONCLUSION

149.    Based on the foregoing, your affiant respectufully submits that there is probable cause to believe that defendants INGRAM, M. JACKSON, A. JACKSON, C. JACKSON, and MOSBY knowingly conspired with each others and with others known and unknown to the United States to knowingly and intentionally possessed with intent to distribute and to distribute controlled substances, namely in excess of 50 grams of mixtures

---

[43] Although the responding officers were notified that MOSBY was hiding the narcotics in his anal cavity, a search of this area could not be conducted on the street without obtaining a search warrant. Because I did not want to reveal that the FBI was monitoring M. JACKSON's cellular phones, the decision was made not to conduct such a search.

containing cocaine base in the form of crack cocaine in violation of Title 21, United States

Code, section 841(a)(1), in violation of title 21,  United States Code, Section 846, and Title

18, United States Code, Section 2.

LARRY L. LAPP
Special Agent
Federal Bureau of Investigation


SUBSCRIBED AND SWORN TO BEFORE ME
this     day of July, 2008

HONORABLE JEFFREY COLE
United States Magistrate Judge